VOL. 275,       APRIL TERM, 1918.       483

State ex rel. Danciger v. Publ. Serv. Comm.

# THE STATE ex rel. M. O. DANCIGER & COMPANY v. PUBLIC SERVICE COMMISSION et al., Appellants.

### Division Two, July 16, 1918.

1. **PUBLIC SERVICE: Motive for Discontinuance: Law of Case.** The motive for discontinuing the supply of electricity to citizens of a town by a firm which for sometime had essayed to furnish it to some of them, is of no concern to the courts in determining whether said firm had a legal right to discontinue the service. If the citizens are not under the law entitled to the service, no motive, however reprehensible, for discontinuing it, can serve as a sufficient reason to any court to compel a restoration of it.

2. .————: ————: **Public Utility.** If the firm which had essayed to sell electricity to a limited portion of the citizens of a town is a public utility, no ill-feeling growing out of a Local Option election and no lack of facilities to furnish the service, will serve as an excuse for discontinuing it, because the Public Service Commission has power to compel the firm to provide reasonable and ample facilities; but if it is not a public utility, no excuse is necessary.

3. ————: **Public Utility: Corporate Powers: Ultra Vires.** In determining whether or not a corporation is a public utility, the important thing is not what its charter says it may do, but what it actually does. If the things it does constitute it a public utility, it will not be heard to say that those things are *ultra vires* of its charter powers, or to urge its own wrongful aggressions to escape its obligations to render the public service.

4. ————: ————: **Definition: For Public Use Understood.** While the statute defining an "electrical corporation" and an "electric plant" does not contain the words "for a public use." they are to be understood and to be read into it. An electric plant must of necessity be devoted to a public use before it is subject to public regulation.

5. ————: ————: **Private Person.** A single person, having constructed an electric plant solely for private use, may, by holding himself out as willing and ready to serve the public, by such profession and by the furnishing of a general public service, become a public utility.

6. ————: ————: ————: **Subject to Full Regulation.** If a private person is a public utility, he is such within the whole purview

484 **SUPREME COURT OF MISSOURI,**

State ex rel. Danciger v. Publ. Serv. Comm.

and for all inquisitorial and regulatory purposes of the Public Service Commission Act.

7. ——: ——: ——: **This Case.** A brewery corporation, whose stock was owned by M. O. Danciger and his brothers, was engaged in the brewing of beer, in a town of 1000 or 1500 inhabitants. It installed a plant for producing electric light and operating by electricity the machinery used in the brewery. Discovering that it was able to produce more electricity than it needed for those purposes, it began to make special private contracts to furnish current for light and power to certain private persons within three blocks of its plant, about thirty in all, and also furnished thirty street lights, for five or six of which it received $19.50 per month, the others being furnished gratuitously. It was not incorporated for this purpose, and the contracts were made with M. O. Danciger & Company, which was simply a trade name of M. O. Danciger. He had no distributing system, and the persons who bought electricity from him constructed their own wires to the electric plant and installed their own meters. He had no franchise or license from the town, neither in his own name or his trade name or any other, nor did he have any permission to erect poles or wires upon the streets or alleys, nor did he have or assert the power of eminent domain, nor did he at any time expressly profess a readiness or willingness to furnish electricity to all persons within the town, or to all those within the restricted three-block area. *Held*, that he was not a public utility, and the Public Service Commission has no power to compel him to continue the service or to regulate it. It cannot be said that a private company which undertakes to sell no more than its surplus electricity to a few near-by citizens, and not to the public generally, is engaged in a public business.

7. ——: **Police Power: State Regulation: Private property.** The police power is bottomed and wholly dependent upon the devotion of private property to a public use. The Constitution forbids the regulation of and the exercise of inquisitorial authority over property devoted to private use, and before the State can exercise such regulation the property must be devoted to a public use.

Appeal from Jackson Circuit Court.—*Hon. C. A. Burney, Judge.*

Affirmed.

*Alex Z. Patterson,* General Counsel, *James D. Lindsay,* Assistant Counsel, and *B. Denny Davis* for appellant, Public Service Commission.

(1) The relator is engaged in a business of the kind defined in the Public Service Act, and is subject

to the jurisdiction of the Commission by the plain terms of the act. Subsections 1 and 5 of Section 16 and Subsections 12 and 13 of Section 2, Publ. Serv. Act of 1913. (2)   The nature and extent of the business done by relator constitutes it a public service company.   Neither a corporate charter as a public service company, nor a franchise from a city, nor the lack of them, are determinative.   The nature of the business and of the service rendered is the decisive test and must control. Terminal Taxicab Company, v. Kutz, 241 U. S. 252; German Alliance Insurance Company v. Lewis, 233 U. S. 389; Ratcliff v. Wichita Union Stock Yards Company, 6 L. R. A. (N. S.) 834 and note; VanDyke v. Geary, 244 U. S. 39; Del Mar Water, Light and Power Company v. Eshleman, 167 Cal. 681, 140 Pac. 948; State ex rel. Subway Company v. St. Louis, 145 Mo. 575; Budd v. New York, 143 U. S. 517; Brass v. North Dakota, 153 U. S. 391; 1 Wyman, Public Service Corporations, sec. 50.   (3)   It is not necessary that a company should serve all of the public to give it the character of a public utility.   No utility serves all of the public.   The public does not mean everybody all of the time.   But what is meant, is a service which affects so considerable a portion of the public, that it is public in the same sense in which any other may be called so.   Terminal Taxicab Company v. Kutz, 241 U. S. 255; Peck v. Tribune Company, 214 U. S. 190; Cawker v. Meyer, 147 Wis. 320.   (4)   The business of furnishing electric current for light and power within a city is one of that large class of concerns which has always been held to be a business clothed with a public interest, and to be subject to regulation by the public.   Exhaustive note in Ratcliff v. Wichita Union Stock Yards Company, 6 L. R. A. (N. S.) p. 834. ˙ (5)   So long as relator undertakes to do a business, and to render a service public in its nature, relator cannot be permitted to discriminate or arbitrarily refuse service.   Section 68, subsection 3, Pub. Service Act.   (6)   The provisions of the act are to be liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities.   Section 127, Public Service Act.

486 SUPREME COURT OF MISSOURI,

State ex rel. Danciger v. Publ. Serv. Comm.

*I. J. Ringolsky, M. L. Friedman* and *Ringolsky & Friedman* for respondent.

(1) Under the facts and the law respondent is not a public utility. State ex rel. Public Commission of Washington v. Spokane & I. E. R. Co., 154 Pac. 1111; Utilities Commission ex rel. Wabash v. Ill. Central, 113 N. E. 162; Cawker v. Meyer & R. R. Commissioners, 147 Wis. 320; Delmar Water, Light & Power Co. v. Eshleman, 140 Pac. 591. (2) The Public Service Act does not give the Commission jurisdiction over plants generating electricity for their own consumption and selling surplus. The act confers jurisdiction only over electrical companies having the right by charter, franchise, special or general laws, to use the streets and highways for the sale of electricity. Laws of State of Washington, 1911, pp. 534, 544; Public Service Act, Sec. 2, Art. 1; Sec. 64, Art. 4. (3) Assuming *arguendo* that the respondent is a public utility the Public Service Commission had no jurisdiction in the instant cases. Lusk v. Atkinson, 268 Mo. 116; Atchison, Topeka & S. F. Ry. Co. v. Public Service Com., 192 S. W. 462; Sec. 83, Laws 1913, 619; State ex rel. Payne v. Kinloch Tel. Co., 93 Mo. App. 349; State ex rel. v. Jones, 141 Mo. App. 304; State ex rel. v. Water, Light Co., 249 Mo. 649; Public Ser. Electrical Co. v. Board, 96 Atl. (4) The Commission has no authority, right or prerogative to designate or select certain specific persons out of many persons as the persons to whom service must be given.

FARIS, J.—This is an appeal by the Public Service Commission and others from a judgment of the circuit court of Jackson County, annulling an order of the Public Service Commission (hereinafter called for brevity simply "Commission") in a case wherein one W. H. Roach, was complainant. After the conventional motions, the Commission and the complainant appealed.

This case is one of three of similar character and bottomed upon identically similiar facts. The relief

severally sought was an order upon M. O. Danciger (trading as M. O. Danciger & Company) to compel him to restore electric service to the complainants, which service, it was alleged, had been by said Danciger cut off without any legal excuse therefor.   The complaints filed before the Commission by the three several complainants were similar in all substantial respects, and wholly similar except that the complaint filed in the instant case averred as a motive for the cutting off of the service, that discontinuance was due to ill-feeling engendered by the attitude of complainant in a Local Option election.

It was shown by the testimony adduced upon the hearing before the Commission that the Royal Brewing Company, situate at Weston, Missouri, is a corporation, the stock of which is largely, if not wholly, owned by respondent M. O. Danciger and his brothers.   The Royal Brewing Company is engaged in the brewing of beer and in the manufacture of so-called soft drinks. The town of Weston contained, according to the last census, a population of 1019 persons, though the evidence adduced tends to show roughly that it now contains about 1500 population.   Some six years before the hearing the Royal Brewing Company (hereinafter called for brevity the "Company") installed in its brewing plant the necessary machinery for producing electric light solely for its own use in lighting its property.   During the last three or four years preceding the hearing before the Commission, the Company has also been using the electric current so generated for the purpose of operating by electricity a large part of the machinery used in its brewing business.   Shortly after the Company put in its private electric plant it discovered that it was able to produce more electricity than was necessary for its own use in lighting and running its plant. It thereupon began to make special private contracts to furnish, under the conditions and circumstances below named, electricity for lighting and power purposes to certain private citizens of the town of Weston, located within a radius of three blocks of the

488    SUPREME COURT OF MISSOURI,

State ex rel. Danciger v. Publ. Serv. ˌmm.

Company's plant. Subsequently it began furnishing to the town of Weston lights for some of the streets and alleys thereof. At the time of the filing of this complaint between twenty and thirty of the business houses, and some ten residences within the area mentioned, were being lighted or partially lighted by electricity from the Company's plant. At this time the city was being furnished thirty or thirty-two lights, for which it paid for only five or six of these the sum of $19.50 per month. The remainder of the lights were furnished gratuitously. All of the electrical energy sold is delivered to consumers at the Company's plant. For, says one of the complainants, "we were told if we would run the line we could have the service." The Company has no distribution system for supplying any of these private persons; nor is it incorporated for this purpose, nor is this purpose mentioned among the things which as a corporation it may do; nor has it a franchise from the town of Weston as an electric lighting company, or any other permission to enter or cross the streets and alleys thereof. It does not itself place or construct any poles or wires upon the streets, alleys or public places of the city; nor does it own any poles or wires. The consumer desiring the surplus light or power furnishes his wire and poles, and bears all cost of constructing the line for transmitting the electric current from the Company's plant to the place of consumption, or he "taps in" on some other private owner's wire. The actual work of construction and installation is usually done, if not always, by employees of the Company, in which case the Company is reimbursed by the private consumer. In some instances the contracts for this installation were made directly with the employees themselves, and the work was done after working hours. In some cases the amount of current consumed is measured by a meter, which meter belongs to the consumer; and in others—the greater number of cases—the amount paid is governed by a flat rate.

The sale of the surplus current, although it is generated by the Company, and with the Company's

machinery, is conducted with consumers by respondent under the said trade name of "M. O. Danciger & Company." The reason for this arrangement was upon the hearing, without any contradiction thereof, thus explained by respondent: "The brewery didn't have a right to go into the lighting business, and I took it up with my brothers, and they said if you have got any friends you want to serve, you had better [not] serve them from the brewery company as a corporation, and that is how I happened to start this M. O. Danciger & Company. I got a little set of books at that time. I didn't really know what they were paying for their lights. Some of them were on flat rates, and every time a man would go around to collect, they would say their next door neighbor's bill wasn't as big as theirs and you must not be charging him as much per kilowatt as you are me. Then I had this form printed they offered in evidence, and gave them around a time or two as receipts. That is how that form happended to be printed, to keep down arguments."

The complainant, Roach, is the owner of a weekly newspaper published in Weston, called "THE WESTON HERALD." About a year, or a year and a half, before the matters here in controversy arose, complainant bought this paper and printing plant from one Taylor. Power and lights were then being furnished by the Company through respondent upon the arrangement above set out to Taylor, and after complainant's purchase of the newspaper the service was continued until June 7, 1916, when the wires were suddenly cut by Danciger, without prior notice, and the service discontinued. Upon demand made for reinstatement of the service, and upon a refusal thereof, this proceeding was brought.

The printed form of receipt mentioned by respondent as having been given by him "a time or two as receipts" to his customers, contained on the reverse thereof a statement of the rates to be charged customers for current furnished for lights. No reference was made in definite kilowatts to rates for motor service,

but the printed form of receipt contained on the back thereof the statement: *"Special rates for motors upon application."* We mention this specifically, because much importance is attached to it by appellants. So far as the record shows these rates were not contained on any receipt after October 15, 1915, and were given out only once or twice *to customers only* prior to that time. No receipt issued after October 15, 1915, contained mention anywhere of the rates charged or of any special rate for motors.

The area of three blocks from the Company's plant is all of the town of Weston which was given any service, and not nearly all of the residences and businesses in this area have this service. The district within three blocks of the plant comprises only about one-fifth of the town of Weston since the Company's plant is situate on the extreme edge of the town. The record discloses that a number of persons, both within the area of three blocks, and without the same, made requests for service, and were refused, because respondent was, he says, unable to furnish this service by reason of lack of surplus current.

There are no contracts in writing with any of the customers of respondent. The arrangement for furnishing the five or six lights to the city, for which the city pays, was made verbally, and is thus related by a witness who was a member of the Board of Aldermen when this arrangement was made: "I spoke to Mr. Danciger, about it, and he said he had no franchise or anything, and I asked him as a favor if he would not permit us to put a few lights down town. Our lights were bad. He said, well if you stretch your own wires and be responsible for the up-keep, that he was not to be responsible for any damage or anything, that he would furnish a few lights. . . . Said, of course sometimes they go out. So we put in at that time about three lights, and then after we got by the fire department, he put a light on the bridge. He wired the fire department *gratis*. . . . The final arrangement was just made between me and Mr. Danciger.

Then I took it up with the Council and told him we were willing.  .  .  :  I asked him if he would come down to the Council, and he did.  .  .  .  He said he could not guarantee us any service, any more than he would do the best he could.  He could not guarantee us any service for any length of time or anything.  He said, and I knew it to be a fact, that his generator was there for his own use for lighting.''  Fairly construed the testimony of Danciger corroborates this witness, and no one contradicts him.

Upon the trial respondent, testifying for himself, was asked to state his reason for cutting off the service from the complainant.  His answer was this: ''The first reason was, that I wasn't holding myself out as a light company, that I was ruining my machinery, that I was running at a loss at the plant.  I have electric-driven machinery that I wasn't able to use, using steam machinery that cost twice or three times the amount of money to operate, and another reason was that these men who were using the current were the last men that got the service.  That was another reason.  The third reason was that I was furnishing these people current at a loss, doing it as a favor and they were abusing me personally, and trying to destroy the business I had, all I had in the world, and I didn't feel any too friendly. Those are the different reasons for cutting off that current.''

The Commission after taking voluminous testimony in the case made a report in which it held that respondent was conducting a public utility; that he owed the duty of serving complainant, and that the discontinuance of the service was without reasonable excuse, and thereupon entered an order that the service be restored. From this order respondent herein took the case by the statutory writ of review, or *certiorari,* to the circuit court, of Jackson County, wherein upon a hearing *de novo* the order of the Commission was annulled. Thereupon the Commission and the complainant Roach appealed.

Much of the record in the case is taken up in an effort to prove and disprove the wholly irrelevant matter of motive. It was strenuously contended at the hearing, in the briefs, and upon argument, that the cutting off of service to this complainant was wholly due to ill-feeling arising from the arid attitude of the complainant and his newspaper in a Local Option election. It is too plain for argument that we are not to determine this matter on a consideration of the antecedent reasons which brought about this proceeding. Whether the action complained of was brought about by reasons which in morals are just or unjust, good or bad, is no concern of the courts and cannot in the remotest way affect the law of this case. This is so because if complainant is entitled to service, he is entitled to it as a matter of law, and if he is not under the law entitled to it, no motive, however reprehensible, for discontinuing the service will serve as a reason for any court to compel the restoration thereof. It is but remotely apposite on the point whether the Local Option question or a lack of facilities to furnish the service constituted the dominating motive. For if respondent is a "public utility," neither excuse will serve; because the Commission has power to compel him to provide reasonable and adequate facilities. If he is not such utility, no excuse is necessary. It is therefore but to pad the case with immaterial irrelevancies to take up the time of counsel, and of this court, with such questions.

*Motive.*

There is but one question in the case. That is a question of law, and is, to-wit: Is M. O. Danciger, trading as M. O. Danciger & Company, engaged in doing such business as by law permits the regulation thereof by the Public Service Commission Act?

*Public Utility.*

In this connection, we may mention in passing, respondent contends that M. O. Danciger & Company cannot be compelled to furnish the service in question, because, since the electric current used is obtained from the brewery company, which is a corporation, the result of such an order would be tantamount to, and result in forcing the company to do, an *ultra vires* act. Upon

this contention, even if it were vital here, it is enough to say that in determining whether a corporation is or is not a public utility, the important thing is not what its charter says it may do, but what it actually does. [Terminal Taxicab Co. v. Kutz, 241 U. S. 252.] In short, if the things done constitute the corporation a public service company, it ought not to be, and will not be, heard to urge its own wrongful aggressions in order to escape regulation. Moreover, the corporation is not a party to this proceeding. Complainant saw fit to concede, in electing to sue M. O. Danciger & Company, that the latter and not the brewery company constitutes the alleged public service entity, and that the explanation of Danciger, as to the relations between the brewery Company and M. O. Danciger & Company is true.

It is contended by appellants that the whole question is settled by sub-divisions 12 and 13 of Section 2 of the Public Service Commission Act, which define an "electric plant" and an "electric corporation," over which plants and aggregations, as defined, other appropriate provisions of this act (Subdivision 25, Sec. 2, p. 560, Laws 1913) confer plenary powers of regulation. The above clauses read thus:

"The term 'electric plant,' when used in this act, includes all real estate, fixtures and personal property operated, controlled, owned, used or to be used for or in connection with or to facilitate the generation, transmission, distribution, sale or furnishing of electricity for light, heat or power; and any conduits, ducts or other devices, materials, apparatus or property for containing, holding or carrying conductors used or to be used for the transmission of electricity for light, heat or power.

"The term 'electrical corporation,' when used in this act, includes every corporation, company, association, joint stock company or association, partnership and person, their lessees, trustees or receivers appointed by any court whatsoever (other than a railroad or street railroad corporation generating electricity solely

494        SUPREME COURT OF MISSOURI,

State ex rel. Danciger v. Publ. Serv. Comm.

for railroad or street railroad purposes or for the use of its tenants and not for sale to others) owning, operating, controlling or managing any electric plant except where electricity is generated or distributed by the producer solely on or through private property for railroad or street railroad purposes or for its own use or the use of its tenants and not for sale to others.''

While the definitions quoted, supra, express therein no word of public use, or necessity that the sale of the electricity be to the public, it is apparent that the words ''for public use'' are to be understood and to be read therein. [State ex rel. v. Spokane Co., 154 Pac. 1110.] For the operation of the electric plant must of necessity be for a public use, and therefore be coupled with a public interest; otherwise the Commission can have no authority whatever over it. The electric plant must, in short, be devoted to a public use before it is subject to public regulation. [Munn v. Illinois, 94 U. S. 113.] Since, the sole right of regulation depends upon the public interest, the subdivisions quoted above, and which define an electric plant and an electric corporation, mean the same, whether the idea of a public use is expressly written therein or not; it is, nevertheless, of necessity connoted and to be understood therein. We are not to be understood as saying that an electric plant constructed solely for private use could not, by professing public service, become by such profession and by the furnishing of general public service, a public utility.

There is in this case no explicit professing of public service, or undertaking to furnish lights or power to the whole public, or even to all persons in that restricted portion thereof who reside within three blocks of the Company's plant. For there is in the case neither existence nor assertion of the right of eminent domain. Nor does there exist any franchise or license, nor has there been obtained from the town of Weston any right or privilege to cross the streets, alleys, or other public places therein, nor are there any charter powers authorizing the company, or the respondent, to engage

in the public service. The fact of *professing public service*, that is, of holding himself or the Company out as ready and willing to serve the public, must there-fore, in order to hold respondent, be deduced implicitly, if it is to be found in this record at all.

It is certainly fundamental that the business done by respondent either constitutes him a "public utility," or it does not. If he is a public utility, he is such within the whole purview and for all inquisitorial and regu-latory purposes of the Public Service Commission Act. If, therefore, what respondent did constitutes him a public utility, other apposite sections of the law confer upon the Commission the power of compelling him to furnish and provide such "instrumentalities and facilities as shall be safe and adequate to furnish service." [Sec. 68, p. 602, Laws 1913.] Still other provisions would seem to confer upon the Commission the power to compel service as to all residences, busi-nesses and purposes, within a radius of three blocks from the Company's plant. Certainly so much could be compelled by orders of the Commission. Absent the matter of franchise, it is possible, we suggest *arguendo,* that plenary authority exists, if respondent be a public utility, to compel the furnishing of the service to the entire town of Weston. The plant is now running at its full capacity, and if any considerable extension of the service thereof were ordered, extensive and expensive additions of machinery to the plan¹ must likewise be ordered. In order to afford such service to the whole town, or even to all persons within the three-block area, the respondent would be compelled to obtain from the town of Weston a franchise permit-ting him to erect poles and wires along and across the public streets and alleys thereof. In an analogous case we have said that the Commission cannot compel a public utility to do a thing wherein the obtaining of a franchise is a condition precedent. [State ex rel. v. Public Service Com., 270 Mo. l. c. 442.]

In the light of these considerations does the business of respondent constitute him a public utility, within

the meaning of the Public Service Commission Act? We are of opinion that it does not. For as forecast above, State regulation of private property can be had only pursuant to the police power, which power is bottomed on and wholly dependent upon the devotion of private property to a public use. If the requirement that the private property shall be devoted to a public use, before it can be regulated, and before inquisitorial authority be exercised over it, *is not to be read into* the applicatory law, then that law is obviously unconstitutional, because it takes private property for public use without compensation.

The precise question before us is one of first impression in this jurisdiction. It has been up before the courts but few times in any jurisdiction. It has been up recently before the Public Service Commissions of the several States a number of times. The holding of the courts thereon, while not absolutely unanimous, has been usually against the contentions of the appellants here (Cawker v. Meyer, 147 Wis. 320; Del Mar Light & Power Co. v. Eshleman, 167 Cal. 666; State ex rel. v. Spokane Railroad Co., 154 Pac. 1110; Brown v. Gerald, 100 Me. 351; Minnesota Canal & Power Co. v. Koochiching Co., 97 Minn. 429; Avery v. Vermont Electric Co., 75 Vt. 235; Fallsburg, Co. v. Alexander, 101 Va. 98; 1 Wyman on Public Service Corps, sec. 243), while a very few of the courts, *and the public service commissions rather unanimously,* have held to the contrary (Wingrove v. Public Service Commission, 74 W. Va. 190, and cases cited in 1918 A. L. R. A.). After a careful examination of the cases Mr. Wyman, in his excellent work on Public Service Corporations, at the section cited supra, says:

"That the business of supplying gas is public in character is now universally recognized, provided that the company supplying is committed to supplying gas to the community in general. But the case can be imagined of an institution with a generating plant for its own supply, which might even supply one neighbor without being obliged to sell to all others. In the same way

the business of supplying electrical energy has generally been recognized as public in character. There are, however, several cases where the company supplying electricity has not professed to sell to the public indiscriminately at regular rates, but has from the beginning adopted the policy of entering into special contracts upon its own terms; such companies are plainly engaged in private business.''

In the late case of Cawker v. Meyer, supra, the Supreme Court of Wisconsin said:

''The State claims that by furnishing heat, light, and power to the tenants of their own building the plaintiffs became a public utility; that the furnishing of such commodities to any one else than to one's self is furnishing it to the public within the meaning of the statute. It is obvious that such a construction is too narrow, for it would constitute the owner of every building furnishing heat or light to tenants, as well as every householder who rents a heated or lighted room, a public utility. The Legislature never contemplated such a construction to be given the words 'public utility.' They must receive a construction that will effectuate the evident intent of the Legislature and not one that will lead to a manifest absurdity. It was not the furnishing of heat, light or power to tenants or, incidentally, to a few neighbors that the Legislature sought to regulate, but the furnishing of those commodities to the public, that is, to whoever might require the same. [Wis. River Imp. Co. v. Pier, 137 Wis. 325, 118 N. W. 857.]''

In the case of Del Mar Water Light & Power Co. v. Eshleman, supra, it was held that even a water company which was organized to furnish water to certain owners of town lots, which had been theretofore sold to such owners by a land company to which the Del Mar Company was an ancillary corporation, had the right to restrict its service to such lot owners, and to a few others of the public whose former water supply had been taken over by the Del Mar Company. Apposite to the facts and questions here it was said in the Del Mar case that:

275 Mo.—32

498 SUPREME COURT OF MISSOURI,

State ex rel. Danciger v. Publ. Serv. Comm.

"The serving of water to the 17 inhabitants of the 'old town' of Del Mar was not sufficient to make the water company a public utility, offering its water to the general public. When the land company bought all the unsold lots of the town site its property surrounded the places of residence of these inhabitants of 'old town.' It bought and abandoned the old wells from which these people derived their supply, and its arrangement with the water company to serve water to them no more constituted the latter a public service corporation than did that contract by which the Santa Fe Land Improvement Company was to receive a certain quantity of the water which might be developed. The sales to contractors who were engaged in road building were no more significant than would be similar accommodations by a farmer from his wells, and the same thing may be said of the trifling amounts of water sometimes sold to neighbors and by them hauled away in barrels. That the water company had refused to furnish persons who had not purchased land from the South Coast Land Company was shown without contradiction; and, while the reasons assigned were sometimes the scarcity of water, the fact of refusal remains. The fact is highly significant. It is also significant that under the arrangement which the water company had with the land company the latter was furnished with a large amount of water through unmetered pipes for the use of its hotel and other buildings. All of these facts and circumstances indicate that the Del Mar Water, Light & Power Company was merely the incorporated water department of the South Coast Land Company."

The case of State ex rel. v. Spokane Railroad Co., supra, which was decided by the Supreme Court of Washington, is practically on all-fours with the case at bar upon the ultimate facts. Not only is this true, but the definitions in our own Public Service Commission Act (and largely the act itself) were obviously taken, with mere slight verbal changes, from the prior Washington enactment on the same subject. [Laws of Wash. 1911, pp. 538-612.] Construing this act in 1916, in a case in-

volving, as here, the question whether the acts done constituted the actor therein a public utility within the purview of the Public Service Commission Law of that State, the Washington Supreme Court, in an able opinion by MOUNT, J., said:

"We understand the law in this State to be that companies furnishing electrical energy may or may not be public service corporations, depending upon the objects for which they were organized and the business in which they are engaged, the logic of the cases being that we will judicially inquire whether the sale of power is a selling to the public generally or is only an incident to the business in which the company is engaged . . . The character of such companies and their relation to the public has been frequently considered by this court. We find no departure from our first holding that a sale of electrical energy or power for private enterprises is not an engaging in a public business and gives such companies no right to assert the sovereignty of the State. [Citing authorities.] . . .

"It is argued that the present act (1911) furnishes ample authority for holding that public necessity, as evidenced by the legislative declaration, now requires that such companies be held subject to regulation in their private affairs, and that the right of the public to the enjoyment and use of such property is regulated, guaranteed, and safeguarded by appropriate legislation. But we think the act does not go so far . . . Granting for the sake of argument the right of the Legislature to exercise the police power to the extent of regulating and controlling the price to be charged for power sold to private individuals or to others, such right should not be declared by the courts in the absence of express legislation. The regulation and control of business of a private nature is sustained by reference to the police power, and even then it is sustained only when courts have been able to say that a business is in character and extent of operation such that it touches the whole people and affects their general welfare. It is upon this principle

that Noble State Bank v. Haskell, 219 U. S. 104, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487, and German Alliance Insurance Co. v. Kansas, 233 U. S. 389, 58 L. Ed. 1011, L. R. A. 1915C, 1189, rest. Until the Legislature brings a business within the police power by clear intent, courts will not do so. . . .

"Neither has the business of selling surplus power been so notoriously beset by abuses that we can judicially notice it as having an outlaw character. The right to regulate under the present law must be measured by the public interest. It will hardly be contended that appellant's contracts with those to whom it sells its surplus are of any interest or concern to anyone other than the immediate parties. It is not alleged that it is neglecting its public duty because of them. No one has a right to compel appellant to sell its surplus. The act of sale is purely voluntary. Like the merchant it can sell at one price to one man and at another price to another. . . . If either is not content with the offering of the other he does not have to contract. He can go his way. But it is not so with appellant, when exercising its public function, that is, furnishing something—a necessity—that all are entitled to receive upon equal terms, under equal circumstances and without exclusive conditions. [Beale & Wyman, Rate Regulation, sec. 1.]"

The case of Van Dyke v. Geary, 244 U. S. 39, is strongly relied on by appellants as upholding their contentions. We do not regard it as doing so, and we have no quarrel with the law announced, upon the facts existing in that case. The facts, which in our view differentiate that case from this one, are at page 48 thus stated by the court in the opinion: "Counsel contend that the use is not public, because water is furnished only to particular individuals in fulfillment of private contracts made with the purchasers of town-site lots. *But there is nothing in the record to indicate that such is the fact.*" (Italics our).

The rule by which profession of public employment is to be tested, where, as here, such profession arises, if at all, implicitly, is thus laid down by Mr. Wyman:

"The fundamental characteristic of a public calling is indiscriminate dealing with the general public. As Baron ALDERSON said in the leading case: 'Everybody who undertakes to carry for anyone who asks him is a common carrier. The criterion is whether he carries for particular persons only, or whether he carries for everyone. If a man holds himself out to do it for everyone who asks him, he is a common carrier; but if he does not do it for everyone, but carries for you and me only, that is a matter of special contract.' This regular course of public service without respect of persons makes out a plain case of public profession by reason of the inevitable inference which the general public will put upon it. 'One transporting goods from place to place for hire, for such as see fit to employ him, whether usually or occasionally, whether as a principal or an incidental occupation, is a common carrier.'" [1 Wyman On Pub. Service Corps., 227.]

Testing the facts of the instant case by this rule, and by the rule announced by the majority of the courts, as well as by the reason of the thing, and the far-reaching results of any other view, rather than by the view taken by a majority of the Public Service Commissions of the several states, we are constrained to hold that as to complainant, the respondent owed him no continuing public duty of service, and that the view taken *nisi* is correct.

It follows that the case ought to be affirmed. Let this be done. All concur.