T. H. WALTON, JR., DEFENDANT IN ERROR, v. A. B. C. FIREPROOF WAREHOUSE COMPANY, A CORPORATION, PLAINTIFF IN ERROR.—151 S. W. (2d) 494.

Kansas City Court of Appeals.   May 5, 1941.

940

*James B. Nourse* for plaintiff in error.

*Harry B. Jenkins* and *Walter A. Raymond* for respondent.

942

BLAND, J.—This is an action to recover damages for the loss of household goods belonging to the defendant in error, plaintiff below, which he alleges were delivered to the plaintiff in error, defendant below, as a common carrier.

Plaintiff below recovered a verdict in the sum of $688.35, but remitted therefrom the sum of $13.41, the amount of the transportation charges. A judgment was entered in favor of plaintiff below in the sum of $674.94. Defendant below has brought the case here by writ of error. This is the second appeal in the case. [See Walton v. A. B. C. Fireproof Warehouse Co., a corp., 124 S. W. (2d) 584.] Hereinafter the parties will be referred to as they were designated in the court below.

The goods in question were delivered to the defendant in Kansas City for shipment to Joplin but it turned them over to a trucking company at Kansas City, known as the Sunflower Lines, Inc., which contracted with defendant to transport them to Joplin. Defendant took a bill of lading from the trucking company, in which defendant was described as the shipper and plaintiff the consignee. At Arma, Kansas, the Sunflower Lines truck, in which the goods were being transported, collided with a train and most of the goods were destroyed. The bill of lading showed the declared value of the goods to be 10 cents per pound and the Sunflower Lines, Inc., attempted to

settle on this valuation and, in this connection offered, in full settlement, the amount of $78.79. Plaintiff refused to accept this amount on the ground that he was entitled to the full value of the goods, which, he claimed to be $688.25.

Defendant is engaged in the storage, packing and the forwarding of goods and carrying goods as a common carrier. It owns three warehouses in Kansas City.

When the case was here before plaintiff was seeking to recover on the ground of negligence. After the judgment was reversed and the cause remanded, plaintiff amended his petition so as to allege the delivery of the goods in good condition to the defendant, a common carrier, and the failure of defendant to redeliver them. In other words, the amended petition attempted to recover on the insurer theory of liability. In the last trial, as in the former one, the case was defended on the ground that the defendant received the goods as a warehouseman, not as a common carrier and, as such, acted as plaintiff's agent in selecting a carrier to transport them from Kansas City to Joplin.

Plaintiff was employed by the Universal Credit Company, located in Kansas City, and had been transferred by it to Joplin. The employer customarily provided the moving of household effects of their employees when they were transferred and it did so in this instance.

J. A. Clark, the manager of the local office of the Universal Credit Company in Kansas City, made all arrangements for the shipment of plaintiff's goods. The employer had often used the defendant to transport goods of its employees when the latter were transferred.

Defendant insists that the court erred in refusing its instruction in the nature of a demurrer to the evidence, offered at the close of all of the evidence, for the reason, among others, that there was no evidence that the defendant accepted plaintiff's goods as a common carrier for shipment to Joplin or that it undertook, by contract, to ship the goods as a common carrier in this instance, or, that it held itself out so as to lead the public or, more particularly, Clark, in this instance to believe that it was undertaking to act as a common carrier. There is no evidence of any expressed contract wherein defendant agreed to carry to Joplin the goods in question as a common carrier and, if there is any evidence to support a theory of the relationship of shipper and common carrier between the parties hereto, it must be based upon inferences to be drawn from the testimony. The arrangement was made between Mr. Clark, for the plaintiff, and Mr. Thomas, on behalf of defendant, assisted in some minor respects by Mr. Newman, an employee of the defendant.

Mr. Thomas was secretary-treasurer of the defendant company and had known Mr. Clark for a period of 3½ or 4 years. On occasions Mr. Clark had called Mr. Thomas to procure the defendant to transport goods of the employees of the Universal Credit Company.

Mr. Clark, testifying for the plaintiff, stated that on the occasion in question he called Mr. Thomas on the telephone and requested him to go to plaintiff's apartment in Kansas City and examine the goods to be shipped and give the witness an estimate of the cost for shipping them to Joplin. After having the goods inspected Mr. Thomas called Mr. Clark on the telephone and, according to the latter, he told him, to the effect, that defendant's vans did not regularly make trips to Joplin and unless defendant took the goods down with other goods the charge would be about $60 but, if shipped with other goods, it would be around $30 to $35. Thereupon, Mr. Clark directed Mr. Thomas to get the goods and take them to defendant's warehouse and that he would advise Mr. Thomas in a day or two when to ship them. Mr. Clark further testified that, in about two or three days, he was in Joplin and ascertained that an apartment there had been procured by plaintiff. Thereupon, he called defendant by long distance telephone and asked to talk to Mr. Thomas, but the latter was out, so he talked to Mr. Newman, another employee of the defendant, and requested him to ship the goods the following morning, if possible. When Mr. Newman asked him for details about the shipment, Mr. Clark replied: "Mr. Thomas knows all about it, just leave it to Mr. Thomas." Mr. Thomas, upon being advised by Mr. Newman of this conversation, called the Sunflower Lines, a common carrier hauling by truck, and requested it to come to defendant's warehouse in Kansas City and get the shipment for its night haul to Joplin. This was done by the trucking company.

Mr. Thomas, who testified for the defendant, stated, concerning the second conversation with Mr. Clark, to the effect that he called the latter over the telephone and told him that the charge for packing the goods will be $12, for hauling them to defendant's warehouse $7, and that if the defendant sent the goods either by railroad or by a merchandising truck hauling concern, making the trip every day, the freight would be about $15; that if Mr. Clark wanted "it in our own van, we had two methods, one where we sent out our trucks any day on special shipments, or taken when we were making a regular trip, the rates would be different;" that the charge for special shipment would be $60.55 and for a regular trip it would be $28.27; that he gave him estimates on all three methods of handling the shipment and recommended the Sunflower Lines "because of the fact it was cheaper;" that he told Mr. Clark that the Sunflower Lines had connections with the Tommie's Transfer Company in Joplin and that company, when the goods arrived in Joplin, could take the shipment to plaintiff's house and unpack it for him; that if the goods were shipped either by railroad or freight truck the goods would be moved at a 10 cents per pound valuation; that Mr. Clark told him to get the goods and take them to defendant's warehouse and hold them there for further instructions.

Mr. Newman testified substantially as did Mr. Clark in reference to the conversation had between those two, and that he related the same to Mr. Thomas. Mr. Thomas testified that after talking to Mr. Newman he had arrangements with the Sunflower Lines to carry the goods, because this was the least expensive method of getting the goods to Joplin. However, he testified that Mr. Clark did not tell him what method to use or that he wanted the goods hauled at the lowest possible cost: "I followed the instruction I received to use my own judgment."

Other facts bearing upon the question as to the relationship between the plaintiff and the defendant in this transaction, were testified to by Mr. Clark. He stated that never, in any dealings that he had theretofore had with Mr. Thomas, had defendant ever used another company to transport the goods involved in those dealings; that in this particular instance no other company was mentioned either by Mr. Thomas or the plaintiff. He further testified that, he had learned that, on another occasion, his company had engaged the defendant to transport goods to Joplin, but that he did not know whether defendant used the Sunflower Lines on that occasion. According to defendant's evidence it did.

Mr. Clark also denied hearing of any valuation of 10 cents per pound until after the loss of the goods involved herein. He testified that no matter of valuation or value of the goods was mentioned by either Mr. Thomas or himself; that if defendant had sent the goods down in its own van without other goods being therein, his company would have paid $60 for their transportation; that there were two methods by which defendant could have made the shipment, one on a $30 or $35 basis and the other on a $60 basis; that when he told Mr. Newman he was leaving it to Mr. Thomas, he was authorizing the latter to use his best judgment and have the goods in Joplin the next morning, if possible. He further testified: "I knew nothing about how he (Thomas) was going to do, bring it down by his own truck or what."

At the trial plaintiff's counsel asked Mr. Clark what he meant when he said "leave it to Mr. Thomas," but the court sustained defendant's objection to the question. However, there is a plain inference from the testimony of Mr. Clark that what he was leaving to Mr. Thomas was the question as to whether Mr. Thomas should ship the goods with other goods or make the goods in question the subject of a sole shipment. Clark did not inquire of Newman if any other goods had been assembled by the defendant for shipment to Joplin at the time and, so far as the evidence shows, did not know anything about that matter.

The shipment in question consisted, not only of a large number of items of ordinary household goods, but a piano and a radio. The household goods had been packed by plaintiff's wife in boxes and

barrels and defendant was only required to place tops upon these containers. However, it was required to crate the piano and the radio. These two latter items were made a special shipment and a settlement was made with the Sunflower Lines for the loss of these. However, defendant rendered a bill to the Universal Credit Company for $12 for packing and $7 for drayage of the goods from plaintiff's apartment to its warehouse, and included in the bill a charge of $13.31 for freight to Joplin.

A common carrier has been defined variously, the definitions not being necessarily inharmonious. In this connection, the Supreme Court of this State has stated: "In State ex rel. v. Public Service Commission, 275 Mo. 483, 205 S. W. 36, the following from I Wyman on Public Service Corporations, 227, was quoted with approval: 'The fundamental characteristic of a public calling is indiscriminate dealing with the general public.' As Baron Alderson said in the leading case: 'Everybody who undertakes to carry for any one who asks him is a common carrier. The criterion is whether he carries for particular persons only, or whether he carries for every one. If a man holds himself out to do it for every one who asks him, he is a common carrier; but if he does not do it for every one, but carries for you and me only, that is a matter of special contract.' This regular course of public service without respect of persons makes out a plain case of public profession by reason of the inevitable inference which the general public will put upon it. 'One transporting goods from place to place for hire, for such as see fit to employ him, *whether usually or occasionally, whether as a principal or an incidental occupation,* is a common carrier.' " (Italics ours.) [State ex rel. Anderson v. Witthaus, 340 Mo. 1004, 1010.]

It is well established that to constitute one a common carrier of goods, it is not essential that he should own the means of transportation. [13 C. J. S., p. 31.] "To constitute a public conveyance a common carrier, it is not necessary that it should move between fixed *termini* or even or fixed routes. It is held, however, in some jurisdictions that to constitute one a common carrier in a particular instance, the carriage must be over a route or within a territory over or within which there has been a general undertaking by the person —a holding of himself out as undertaking—to carry goods for the public generally, as a business. In other jurisdictions the contrary rule prevails. (Which rule prevails in this State we need not say.) . . . It is not necessary, in order to constitute one a common carrier, that he make regular trips." [9 Am. Juris, p. 434.]

We think there was substantial evidence in this from which the jury could infer that there was a contract made between Mr. Clark and the defendant for the carriage of the goods by it from Kansas City to Joplin. According to the testimony of Mr. Clark no rate was quoted by Mr. Thomas except that made by the defendant for

*hauling in its own vans.* The two witnesses substantially agree as to the conversation relative to these rates. Of course, Mr. Thomas claimed that he quoted Mr. Clark another rate of about $15, mentioning the Sunflower Lines and that the valuation would be 10 cents per pound. However, the jury was privileged to disbelieve Mr. Thomas' testimony about the third rate quoted and believed Mr. Clark, that no such rate or conditions connected therewith were mentioned by Mr. Thomas. Consequently, if Mr. Clark's testimony is to be believed, then, it was understood between them both that the goods were to be hauled in defendant's van and, if so, of course, the contract was made for the defendant to do the hauling. The railroads and regular trucking companies made no such rates as quoted by Mr. Thomas. There is no doubt but that defendant was a common carrier and its facilities were open to the public for the carriage of goods from Kansas City to Joplin in its vans. The fact that its vans did not run on regular schedules or make regular trips, makes no difference. Defendant, a number of times before, had hauled goods by contract made between Mr. Clark and Mr. Thomas and, never before, in such instances had defendant employed others to do the hauling. When these two men made the contract in this instance no other carrier was mentioned. From all of the circumstances the jury could have well found that both men understood that defendant was to do the hauling.

It is true, at one place in his testimony, Mr. Clark stated: "Q. You were perfectly willing to trust Mr. Thomas' judgment, had he brought it down by his own truck and made a charge of $60, is that correct? . . . A. I was perfectly willing to trust Mr. Thomas's judgment. *I knew nothing about how he was going to do, bring it down by his own truck, or what.* . . . Q. Willing to trust his judgment had he moved it along with other goods with his own transportation facilities and charged $30? A. There were two ways for it to be sent, which I have testified to. One was it would be around $30 to $35 if it had to be hauled with other goods, and if direct, it would be about $60." (Italics ours.)

Defendant makes much of the point that Mr. Clark understood that Mr. Thomas was privilged to use a truck other than defendant's own in which to haul the goods. However, Mr. Clark did not say that he understood Mr. Thomas could select another *company* to do the hauling. Taking all of his testimony together, it may be reasonably inferred that Mr. Clark understood that the goods were either to be shipped by defendant in its own truck or van, or the truck of someone else for whom defendant would assume full responsibility. It was not unreasonable for Mr. Clark to assume that defendant might use some truck other than its own for the purpose of carrying out the arrangements and, at the same time, understand that defendant was assuming responsibility for the shipment.

948

However, it is claimed that, even if defendant is to be regarded as a common carrier, in this instance, it is not legally liable because it delivered the goods to a connecting carrier, and that they were destroyed while in the latter's possession without negligence on the part of the former.

In this connection defendant says: ''When defendant transported the goods from plaintiff's apartment to its warehouse, the transportation was over defendant's regular 'route' or line—that is, from point to point in Kansas City. But the 'continuance' of the shipment from Kansas City to Joplin was not over defendant's regular route or line. Defendant had no truck going to Joplin, and could not have sent the goods by its own truck, except by making a special trip for that purpose.''

There is no merit in this contention for two reasons: In the first place, defendant was a common carrier of goods between Kansas City and Joplin, and for the whole distance. The fact that its trucks made no regular trips makes no difference. In the second place, there is evidence, tending to show that a contract was made for the defendant to carry the goods to Joplin. There need be no evidence of an expressed stipulation to that effect, but such may be implied or inferred from the evidence. [Buffington v. Road, 118 Mo. App. 476; Keithly v. Luck, 190 Mo. App. 458, 465; Hutchinson on Carriers (3 Ed.), sec. 231.] But defendant says there is no evidence from which the jury might infer that there was a contract for a through shipment. It is true, as defendant says, that the fact that a carrier receives goods and gives a through rate, is not conclusive on the question as to whether the contract is for a through shipment. However, as we have already pointed out, there was evidence that defendant agreed to carry the goods in its own van; that the rate quoted was one peculiar to defendant and was not that charged by the railroads or regular trucking companies; that no other carrier was ever used in the dealings between Mr. Clark and Mr. Thomas and none mentioned in this instance. We think that there is ample evidence from which the jury could arrive at the conclusion that there was a contract for a through shipment. Of course, the fact that defendant did not receive any part of the money charged by the Sunflower Lines, under its contract with the latter, is not determinative of the issue under the circumstances of this case.

However, defendant insists that the court errer in refusing to permit the introduction in evidence of its Exhibit ''D.'' This exhibit was a notation or memorandum made by Mr. Thomas at the time he gave the rates and charges to Mr. Clark over the telephone and which it is claimed tends to corroborate his testimony relative to that conversation. Thomas refreshed his memory by the use of this memorandum, but the court refused to permit the defendant to introduce it in evidence. The memorandum is rather sketchy but we may assume

that it is fair upon its face and tends to corroborate Mr. Thomas in the respect claimed. However, it was not made in the presence of the plaintiff and it was not shown that it was made in the usual or regular course of defendant's business and the court committed no error in rejecting it. [20 Am. Juris., p. 795; Nall v. Brennan, 23 S. W. (2d) 1053.] The opinion in the case of Smith v. Nicholson, 221 Mo. App. 428, cited by the defendant, does not disclose that the memorandum there held to be admissible was not made in the presence of the objecting party.

The judgment is affirmed. All concur.