PUBLIC SERVICE COMMISSION ET AL. *v.* PANHANDLE
EASTERN PIPELINE COMPANY.

[No. 28,225. Filed February 5, 1947. Rehearing denied
March 25, 1947.]

664

*James A. Emmert,* Attorney General, *Frank E. Coughlin,* First Assistant Attorney General, *Karl J. Stipher,* Deputy Attorney General and *Urban C. Stover,* Special Assistant to the Attorney General, for appellant Public Service Commission of Indiana.

*Evans & Hebel, William P. Evans* and *Edmond W. Hebel,* all of Indianapolis, for appellant Indiana Gas & Water Company, Inc.

*Vanatta, Batton & Harker,* and *Robert R. Batton,* all of Marion, and *Carl E. Hartley,* of Muncie, for Central Indiana Gas Company.

*John E. Fell,* of Kokomo, for Kokomo Gas & Fuel Company.

*Lawyer & Anderson, John C. Lawyer,* and *R. Stanley Anderson,* all of Hammond, for Northern Indiana Public Service Company.

*Ortmeyer, Bamberger & Ortmeyer,* and *Edmond F. Ortmeyer,* all of Evansville, for Southern Indiana Gas and Electric Company.

*William A. McClellan,* of Greenfield, for Greenfield Gas Company, Inc.

*Russell E. Wise,* of Union City, and *Owen S. Boling,* of Indianapolis, of counsel, for corporate appellants.

*Frederick G. Hamley* and *John E. Benton, Amicus Curiae,* both of Washington, D. C., for National Association of Railroad and Utilities Commissioners.

*John S. L. Yost,* of New York City, N. Y., *Samuel H. Riggs,* of Chicago, Illinois, *Bowen, Mendenhall &*

*Hunter,* and *William R. Hunter,* of Winchester, *Crumpacker, May, Carlisle* and *Beamer,* and *George N. Beamer,* all of South Bend, *Barnes, Hickam, Pantzer & Boyd, Alan W. Boyd* and *Jerry P. Belknap,* all of Indianapolis, for appellee Panhandle Eastern Pipeline Company.

YOUNG, J.—In this case we have to do with the right of the State of Indiana to regulate service and fix rates upon deliveries of natural gas from an interstate pipe line direct to large industrial consumers within the State.

Appellee owns a large pipe line, through which it transports natural gas from Texas and Kansas into and across intervening states, including Indiana, to Ohio and Michigan. At different points along this line, gas is diverted into branch or lateral lines, smaller in size and at lower pressure, to be delivered to distribution systems owned and operated by various municipalities and public utility corporations and directly to selected, large industrial consumers of gas within practical distance of its through line.

When these proceedings started appellee furnished gas in Indiana to 10 utilities, including the corporate appellants, and four municipalities who, in turn, distributed such gas to 112,000 residential, industrial and commercial consumers in Indiana. One of these laterals takes off from the main line near Winchester, Indiana, and at the end of this lateral there are two branches, one leading to a meter house, through which deliveries are made to Indiana-Ohio Public Service Company, which owns a distribution system serving Winchester and nearby territory. The other branch leads to another meter house, through which gas is delivered direct to the Anchor-Hocking Glass Corporation for its own consumption. Service to Anchor-Hocking is,

and service to other large industrial consumers will be, under special, privately negotiated contracts, each upon terms agreed upon for its particular case.

Appellee's gas enters Indiana at a pressure of about 250 pounds per square inch in 22 inch mains. After reaching Indiana the pressure is reduced to approximately 200 pounds per square inch in 16 inch mains. When the Winchester lateral leaves the main line, pressure is reduced to 80 or 100 pounds per square inch and there is no provision whereby it may ever be returned to the main line. Thereby it is segregated from the gas flowing interstate in the main line but the continuity of flow from the source to the meter houses is not interrupted. At the meter houses referred to pressure is again reduced and some deliveries are made to Anchor-Hocking at 40 pounds per square inch and some at 10 pounds per square inch. Deliveries are made to the Indiana-Ohio Public Service Company at 9 to 25 pounds per square inch. In both cases all facilities up to the pipe on the outlet side of the meter houses are owned and operated by appellee. The Winchester lateral is located in part on public highways in Randolph County pursuant to authority granted by the Board of Commissioners of that county to a predecessor of appellee which built the line. For what significance it may have, we know judicially that appellee's main line and other laterals could not cross the state and branch out into the areas served without at least crossing highways and probably otherwise using same pursuant to arrangement with local governmental units.

The quantity sold to Anchor-Hocking is many times the quantity sold to the Indiana-Ohio Company. Anchor-Hocking was the only industrial consumer in Indiana served direct by the appellee at the time of commencement of these proceedings. Subsequently, how-

ever, service direct to a DuPont plant, near Fortville, Indiana, was undertaken under contract and appellee had adopted a policy of furnishing gas direct to selected large industrial consumers in Indiana, as it is doing in other states. Before appellee began serving Anchor-Hocking, Anchor-Hocking had been buying its gas from a local distributing utility which, in turn, had purchased it from appellee or its predecessor.

It appears that in like manner, as appellee begins service direct to other large industrial consumers, it will, in most, if not all, instances supplant service by local public utility companies. These local distribution utilities have expressed alarm that taking away their large customers, thereby decimating the volume of their sales, will cripple their ability to serve domestic and small commercial and industrial consumers at fair rates.

In this situation, the Public Service Commission of Indiana instituted an investigation of the affairs of the appellee so far as same relate to sales of gas under contract direct to Anchor-Hocking Glass Corporation or any other industrial consumer or consumers of natural gas within the State of Indiana. (§ 54-112, Burns' 1933.) The corporate appellants intervened. This investigation resulted in an order on November 21, 1945, by the Public Service Commission of Indiana, requiring appellee to file with the Commission its tariffs covering rates, rules and regulations pertaining to any and all sales of natural gas by appellee direct to ultimate consumers within the State of Indiana, and to file annual reports on forms prescribed by the Commission, so long as it continues to distribute gas direct to any consumer in Indiana, and to file certain other relevant reports and data. In the original order, the Commission concluded and said "that the distribution

in Indiana of natural gas direct to consumers is subject to regulation by this Commission under the laws of this state." It was contended by appellee that the Commission's order constituted an assumption of jurisdiction to regulate appellee's rates and service direct to consumers in Indiana, and that such regulation could not be accomplished without violation of the Commerce Clause of the Federal Constitution. Accordingly appellee filed a statutory action to secure a judicial review of said order and to have said order set aside and its enforcement enjoined.

In the course of the hearing in the trial court, the appellant Commission contended that the action was premature because the order complained of merely required information which it was entitled to have, regardless of its power, or lack of power, to fix rates or otherwise regulate sales of gas by appellee directly to large industries for use by them in Indiana, and that no action will lie to test such power until the Commission attempts to exercise same. Acting upon this contention the counsel for the appellant Commission, appellee offered, in writing, to file with the Commission "all papers and documents specified in the order dated November 21, 1945, provided the Commission desires the same for information purposes only and not as an assertion of the regulatory jurisdiction of respondent's business, and *provided* said order is so modified or such further order is entered by the Commission as to preclude the possibility of any contention hereafter that respondent will be in any manner prejudiced in its right to contest the jurisdiction of the Commission to regulate its said business in the event the Commission shall hereafter assert the right, power, authority or jurisdiction to regulate the same."

The Commission declined to accept appellee's filing of the required papers upon the conditions named in the appellee's offer and, in doing so, the appellant Commission made a supplemental order in which it asserted categorically that the tariffs, rates, rules and regulations, the annual reports and the accounting information, required by the original order when filed, shall be deemed to be on file and be available, among other things, for use by the Commission "in connection with the regulation of rates and service appertaining to the supplying of natural gas by Panhandle direct to consumers within the State of Indiana." Notwithstanding the language of the original and supplemental orders, the Commission continues to take the position that its power to regulate appellee's sales and deliveries of gas direct to large consumers in Indiana is not involved in this proceeding. With this contention we cannot agree.

On authority of *Public Utilities Commission* v. *United Fuel Gas Co.* (1943), 317 U. S. 456, 459, 465, 468, 87 L. Ed. 396, 398, 401, 403, we hold that the orders of the Commission, in this case, constitute an unequivocal assertion of power and jurisdiction to regulate and fix rates upon sales of natural gas from appellee's interstate pipe line direct to large industrial consumers of gas in Indiana, and that they were sufficient to present to the trial court and to this court the question of the jurisdiction and power of appellant Commission to fix rates for such sales and service and to make regulations with reference to same.

The trial court reached the conclusion that the delivery of natural gas by appellee direct to industrial consumers connected with its lines constituted interstate commerce and that the orders of the Public Service Commission of Indiana under attack violated

the commerce clause of the Federal Constitution, and it vacated and set aside the orders of the Public Service Commission of Indiana complained of, and enjoined the Commission and the members thereof from enforcing said orders or any paragraph thereof. The Public Service Commission of Indiana, and the individual members thereof, filed a motion for a new trial and same was overruled. Likewise the corporate appellants filed motions for a new trial, which were overruled and appeals were taken to this court.

In determining whether or not the Indiana Commission has jurisdiction to regulate and fix rates for deliveries of gas by appellee, direct to large industrial consumers in Indiana, we should first consider whether such deliveries constitute intrastate commerce. If they do then the state may regulate and what the Indiana Commission has done does not violate the commerce clause of the Federal Constitution. But if they constitute interstate commerce that does not necessarily mean the state may not, under any circumstances, intervene.

Natural gas is a commodity which may be transported as an article of commerce. Its transmission from one state to another constitutes interstate commerce. *State ex rel. Corwin* v. *The Indiana and Ohio Oil, Gas, and Mining Co.* (1889), 120 Ind. 575, 577, 579, 22 N. E. 778; *Pennsylvania* v. *West Virginia* (1923), 262 U. S. 553, 596, 67 L. Ed. 1117, 1132; *Missouri ex rel. Barrett* v. *Kansas Natural Gas Co.* (1924), 265 U. S. 298, 307, 68 L. Ed. 1027; *Public Utilities Commission* v. *Landon* (1919), 249 U. S. 236, 245, 63 L. Ed. 577.

Appellee contends that under the rule just stated where gas flows continuously without interruption from out-state gas fields direct to in-state consumers, the de-

liveries to in-state consumers constitute interstate commerce. We recognize that this is a sound conclusion, but it is contended by appellants that there is interruption in the flow of gas to Anchor-Hocking and that the sales and deliveries to Anchor-Hocking are, and that in the future sales to other large industrial consumers will be, intrastate in nature. This is predicated largely upon the fact that gas is diverted at low pressures from the main line high-pressure supply to lateral and branch lines in such manner that the diverted gas cannot be restored to the high pressure main line flow. They say that the continuity of movement is broken; that the gas is segregated for a particular intrastate use or uses and they apply to the "broken package" rule to make such sales to Anchor-Hocking intrastate in character. There are cases which apply the "broken package" doctrine to situations not entirely dissimilar and which lend support to appellants' contention. *East Ohio Gas Co.* v. *Tax Commission* (1931), 283 U. S. 465, 75 L. Ed. 1171, 1175; *Southern Natural Gas Corp.* v. *Alabama* (1937), 301 U. S. 148, 81 L. Ed. 970, 974-5; *Mississippi River Fuel Corp.* v. *Smith* (Mo. 1942), 164 S. W. (2d) 370, 375.

However, it is now well established that sales and deliveries from interstate pipe lines to local utilities for resale are interstate transactions. *Natural Gas Act,* 15 USCA, § 717 (b) ; *Missouri ex rel. Barrett* v. *Kansas Natural Gas Co., supra; Public Utilities Commission* v. *Landon, supra; State Corporation Commission* v. *Wichita Gas Co.* (1934), 290 U. S. 561, 563, 78 L. Ed. 500, 502. Such sales and deliveries are, so far as segregation and reduced pressures are concerned, almost exactly like sales direct to large industrial consumers. For example, gas for Anchor-Hocking and gas for the Indiana-Ohio Com-

pany, the distributing utility serving the City of Winchester, and other towns thereabout, leave the main line through the same lateral and at identical pressures. In fact they are inseparably a part of the same flow. This common flow continues until the lateral divides close to points of delivery to Anchor-Hocking and the Indiana-Ohio Company. As has already been shown, the pressures there, while not exactly the same to each, are substantially the same. If the segregation and reduced pressure for delivery to the Indiana-Ohio Company do not make such transactions intrastate commerce under the "broken package" theory, we cannot very consistently apply the "broken package" theory to almost identical deliveries to Anchor-Hocking.

But we need not decide whether the Anchor-Hocking business and prospective sales direct to other large industrial consumers are interstate or intrastate by mechanical standards. Even if they are interstate they still may be subject to state regulation under some circumstances. It has long been established that the power of Congress over interstate commerce is not exclusive. If the Federal Government has not elected to exercise its power under the commerce clause, and if the transaction is not of such nature as to require uniform regulation on a national basis, and if it is so local in its nature and implications that local needs outweigh national interest then, even though interstate, according to mechanical tests, the state may intervene and regulate. *Minnesota Rate Cases* (1913), 230 U. S. 352, 399, 402, 57 L. Ed. 1511, 1541, 1542; *South Carolina State Highway Dept.* v. *Barnwell Bros.* (1938), 303 U. S. 177, 185, 82 L. Ed. 734; *Parker* v. *Brown* (1943), 317 U. S. 341, 359-363, 87 L. Ed. 315; *Cloverleaf Butter Co.* v. *Patterson* (1942), 315 U. S. 148, 155, 86 L. Ed. 754; *Southern Pacific Co.* v. *State*

*of Arizona* (1945), 325 U. S. 761, 766, 89 L. Ed. 1915; *Kelly* v. *Washington* (1937), 302 U. S. 1, 10, 82 L. Ed. 3.

In the *Minnesota Rate Cases, supra,* the question of the conflicting claims of the State and the Federal Government, with reference to interstate commerce regulations, arose. Mr. Justice Hughes, in commenting upon this conflict, said, on p. 399:

". . . It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation, the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act; and, when Congress does act, the exercise of its authority overrides all conflicting state legislation." (Citing many authorities.)

Following this language, the opinion states several things affecting interstate commerce (not involved in the case before us) which the states have no right to do and then on page 402 the court used the following language:

"But within these limitations there necessarily remains to the states until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending Federal intervention. Thus, there are certain subjects having the most obvious and direct relation to interstate commerce, which nevertheless, with the acquiescence of Congress, have been controlled by state legislation from the foundation of the government because of the necessity that they should not remain unregulated, and that their regulation should be adapted to varying local exigen-

cies; hence, the absence of regulation by Congress in such matters has not imported that there should be no restriction, but rather that the states should continue to supply the needed rules until Congress should decide to supersede them. . . . Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the state appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained will of individuals because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the Federal Power. . . ."

In *Cloverleaf Butter Co.* v. *Patterson, supra,* the right of the state to act with reference to interstate commerce is stated in the following words, beginning near the bottom of page 155 of 315 U. S.:

". . . It has long been recognized that in those fields of commerce where national uniformity is not essential, either the state or federal government may act. Willson v. Black Bird Creek Marsh Co. 2 Pet. (US) 245, 7 L. Ed. 412; California v. Thompson, 313 US 109, 114, 85 L. Ed. 1219, 1221, 61 S. Ct. 930. Where this power to legislate exists, it often happens that there is only a partial exercise of that power by the federal government. In such cases the state may legislate freely upon those phases of the commerce which are left unregulated by the nation. But where the United States exercises its power of legislation so as to conflict with a regulation of the state, either specifically or by implication, the state legislation becomes inoperative and the federal legislation exclusive in its application."

These cases, and the language which we have quoted from them, establish that a state may interfere with interstate commerce under some circumstances and indicate those circumstances to be much as we have set them forth above.

The cases cited show a substantial abandonment of the mechanical test of when and where interstate commerce ends and intrastate commerce begins and test the right of states to regulate and tax local phases of interstate commerce by recognizing conflicting state and federal interests and attempting to compose and accommodate and adjust the competing demands that are inherent in our dual form of government. *United States v. South-Eastern Underwriters Association* (1944), 322 U. S. 533, 546, 547, 88 L. Ed. 1440. And the trend of the later cases is as stated in *Prudential* v. *Benjamin* (1946), 90 L. Ed. (Adv. Op.) 1023, 1030, 1031. In that case the broadening of the field of federal intervention in interstate commerce was discussed and then the following language was used at page 1030:

> ". . . the tendency also has run toward sustaining state regulatory and taxing measures formerly regarded as inconsonant with Congress' unexercised power over commerce, and to doing so by a new, or renewed, emphasis on facts and practical considerations rather than dogmatic logistic. . . ."

Under the language and holdings of the cases above cited and quoted, the circumstances of the case before us seem to permit state regulation of sales direct from interstate pipe lines to Indiana consumers.

In reaching this conclusion we find the first prerequisite of state control, i. e. that the federal government has not undertaken to regulate such business. No regulation of interstate natural gas pipe lines and distribution by and through same was attempted by the federal government until Congress passed the Natural Gas Act in 1938. 15 U.S.C.A. § 717, *et seq.* By the Natural Gas Act, § 1 (b), Congress limited the application of the Act by the following language:

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas *for resale* for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but *shall not apply to any other transportation or sale of natural gas or to the local* distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." (Our italics.)

It will be seen that the only sales of natural gas subject to the statute are those for resale. Specifically it does not apply to any other sales, which definitely excludes from its operation direct sales to large industries for their own consumption. *Panhandle Eastern Pipe Line Co.* v. *Federal Power Commission* (1945), 324 U. S. 635, 646, 89 L. Ed. 1241; *Colorado Interstate Gas Co.* v. *Federal Power Commission* (1945), 324 U. S. 581, 588, 89 L. Ed. 1206.

The statute followed the decided cases. The Supreme Court had held that states could not regulate the sale of natural gas from interstate pipe lines to local utilities for resale and distribution through local distribution systems. *Missouri ex rel. Barrett* v. *Kansas Natural Gas Co., supra; State Corp. Commission* v. *Wichita Gas Co., supra.*

Likewise, it had been established that the states did have jurisdiction over sales by local distributing companies, even though the gas had come directly from interstate pipe lines. *Public Utilities Comm.* v. *Landon, supra; Pennsylvania Gas Co.* v. *Public Service Commission* (1919), 252 U. S. 23, 64 L. Ed. 434.

The statute, therefore, served to affirm and implement the rights of control, which the cases had already established. That this was the intent of Congress

is shown by the legislative history of the statute. *Public Utilities Commission of Ohio* v. *United Fuel Gas Co., supra; Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.* (1942), 314 U. S. 498, 506, 507, 86 L. Ed. 371; *Colorado Interstate Gas Co.* v. *Federal Power Commission* (1944), 324 U. S. 581, 600, 601, 89 L. Ed. 1206; *Federal Power Commission* v. *Hope Natural Gas Co.* (1943), 320 U. S. 591, 609, 610, 88 L. Ed. 333.

Referring to the legislative history of the act, and speaking of the scheme of the regulation intended by the Natural Gas Act, the Supreme Court said, in *Public Utilities Commission of Ohio* v. `United Fuel Gas Co., supra,* at page 467:

> "It is clear, as the legislative history of the Act amply demonstrates, that Congress meant to create a comprehensive scheme of regulation which would be complementary in its operation to that of the states, without any confusion of functions. The Federal Power Commission would exercise jurisdiction over matters in interstate and foreign commerce, *to the extent defined in the Act,* and local matters would be left to the state regulatory bodies. Congress contemplated a harmonious, dual system of regulation of the natural gas industry— federal and state regulatory bodies operating side by side, each active in its own sphere. See H. Rep. No. 2651, 74th Cong. 2d Sess. pp. 1-3; H. Rep. No. 709, 75th Cong. 1st Sess. pp. 1-4; Sen. Rep. No. 1162, 75th Cong. 1st Sess." (Our italics).

Inferentially this means that those transactions over which jurisdiction was not given to the Federal Power Commission may be considered as local matters and left to state regulatory bodies. And again we remember that among transactions not included in the act are direct sales to large industrial consumers.

Report No. 709, 75th Cong., 1st Sess., referred to in

the quotation from the United Fuel Gas Co. case, reads as follows:

". . . If enacted, the present bill would for the first time provide for the regulation of natural-gas companies transporting and selling natural gas in interstate commerce. It confers jurisdiction upon the Federal Power Commission over the transportation of natural gas in interstate commerce, and the sale of interstate commerce of natural gas for resale for ultimate public consumption ' for domestic, commercial, industrial, or any other use. The States have, of course, for many years regulated sales of natural gas to consumers in intrastate transactions. *The States have also been able to regulate sales to consumers even though such sales are in interstate commerce,* such sales being considered local in character and in the absence of Congressional prohibition subject to State regulation. (See *Pennsylvania Gas Co.* v. *Public Service Commission* (1920), 252 U. S. 23). *There is no intention in enacting the present legislation to disturb the States in their exercise of such jurisdiction.* However, in the case of sales for resale, or so-called wholesale sales, in interstate commerce (for example sales by producing companies to distributing companies) the legal situation is different. Such transactions have been considered to be not local in character and, even in the absence of Congressional action, not subject to State regulation. (See *Missouri* v. *Kansas Gas Co.* (1924), 265 U. S. 298, and *Public Service Commission* v. *Attleboro Steam & Electric Co.* (1927), 273 U. S. 83). The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act. . . ." (Our italics).

This language of the report clearly indicates the intent of Congress. It clearly indicates that the only sales to be regulated under the provisions of the bill were sales to local distributing utilities for resale. Failure to include sales direct to large industrial con-

sumers indicates the thought upon the part of Congress that uniformity is not required in such sales and that they are so local in nature as properly to be left to state regulation.

We seem to have all the prerequisites to state intervention. Congress has not elected to exercise its power under the commerce clause. Uniformity in control of direct sales from interstate pipe lines to large industrial consumers does not seem to be necessary. There is nothing in the record to indicate that it is. Conditions will differ from area to area and the varying needs will be met by varying procedures. Furthermore, the fact that there has been no uniformity, so far as the record shows, up to this time, and the additional fact that Congress rather deliberately left regulation of such sales out of its regulatory scheme are also indicative that uniformity is not necessary, or at least that Congress did not believe it to be necessary after investigation and reports by the Federal Trade Commission and hearings upon the bill, in which we may assume that the pertinent facts, with reference to character of regulation needed, were developed. It would also seem that Congress did not believe the national interest in the regulation of such business outweighed local needs, and the logic of the situation seems to support such position. The State of Indiana, in its scheme of utility regulation, controls sales to all other consumers of gas brought into Indiana through interstate pipe lines. The sales by local distribution utilities are regulated by the state. The record shows that many industrial consumers are thus provided with natural gas derived from exactly the same source. If sales to some are regulated by the State and others are free from regulation, confusion is natural.

Also if Indiana may not regulate the sale of natural gas from interstate pipe lines direct to large industrial consumers in Indiana, such sales and deliveries will not be regulated at all under present law.

The result will not only be that the pipe line owners, free of regulation, will have advantage over regulated local utilities in competing for business from large industrial consumers, but the customers of the pipe line may be given advantage over the customers of the local utilities. Local utilities whose costs per unit of gas have been increased by the reduced volume of sales caused by the direct deliveries from the pipe lines will be entitled to higher rates and resulting price disparity unfavorable to customers of the local utilities will tend to break down the state system of regulation which will have fixed, and appear to be responsible for, the unfavorable local rates. This probable result, it seems to us, is a weighty consideration in balancing national interest against local need.

While the exact question now before this court has never been decided by the Supreme Court of the United States, cases have been cited which seem to us to be persuasive.

In the cases of *Public Utilities Co.* v. *Landon, supra; Pennsylvania Gas Co.* v. *Public Service Commission, supra; East Ohio Gas Co.* v. *Tax Commission, supra;* and *Missouri ex rel. Barrett* v. *Kansas Natural Gas Co., supra;* deliveries of natural gas to consumers were held to be so local in nature as to permit state regulation and control.

The Landon case, the Pennsylvania Gas Company case and the East Ohio Gas Company case all held that gas taken from interstate pipe lines and delivered to consumers was subject to state regulation. It is true

that these cases all involve sales in municipalities but the fact remains that the gas was all interstate gas and flowed directly from the points where captured through interstate pipe lines and distribution systems to consumers. In the Landon case service to consumers was not directly from the pipe line. There was an intervening distributing company. But in the other two cases gas was supplied to consumers by the pipe line company using distribution systems owned by it directly from sources outside the state. In all three cases the business was held to be so local in nature as to permit state interference by taxation or regulation. The Supreme Court, in later cases, seems to us to have indicated that the result in the Pennsylvania Gas Co. case was predicated largely upon the fact that the sales involved were to consumers. *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.*, p. 505, *supra;* *Jersey Central Power & Light Co.* v. *Federal Power Commission* (1943), 319 U. S. 61, 80 L. Ed. 1258. In the Barrett case, which did not involve sales to consumers but to distributing companies for resale, the Landon case and the Pennsylvania Gas Company case were discussed and it was said, on page 309 of 265 U. S.:

> "In both cases the things done were local, and were after the business in its essentially national aspect had come to an end. The distinction which constitutes the basis of the present decision is clearly recognized in the Landon Case. The business of supplying, on demand, local consumers, is a local business, even though the gas be brought from another state, and drawn for distribution directly from interstate mains; and this is so whether the local distribution be made by the transporting company or by independent distributing companies. In such case the local interest is paramount, and the interference with interstate

commerce, if any, indirect and of minor importance. . . ."

By this language the Supreme Court of the United States seems to us to indicate that the test is whether or not local business is involved and that supplying local consumers is a local business. It does not seem to be material whether the service is by the transporting company or by an independent distributing company. In the case before us the sales are and will be to local customers for their own consumption. Therefore, paraphrasing the language quoted, the local interest is paramount and interference with interstate commerce, if any, is of minor importance and permissible.

In the case of *Southern Natural Gas Corp.* v. *Alabama, supra,* the validity of a franchise tax on a pipe line company was involved. The pipe line company furnished natural gas to three distributing utilities and this business was, of course, interstate under the Natural Gas Act and the decisions we have already cited. It also distributed gas directly to one large industrial consumer. The gas to this consumer was delivered in continuous movement from out-state gas fields. The court held that the tax was valid and in doing so indicated that the sale of gas to the one industrial consumer was so local or intrastate in nature as to justify the tax, which could not be imposed if the pipe line company was engaged only in interstate commerce.

There are many other cases cited by the parties on this phase of the case which have been helpful in reaching our conclusion. We have examined all of them, but discussion of more of them would only unnecessarily further prolong this opinion.

We may add in connection with our comment on the decided cases that we have had in mind that taxation

by a state and the exercise of its police power are not always justified by the same facts. It very recently has been said by the Supreme Court of the United States [*Freeman* v. *Hewit,* (1946), 329 U. S. 249, 91 L. Ed. 205] that state taxation of local aspects of interstate commerce will be more carefully scrutinized and more consistently resisted than state regulation under the police power. After weighing the competing State and Federal interests interference with local phases of interstate commerce by taxation would not be. It is pointed out that there are always other sources from which revenue may be derived by taxation and that revenue serves as well no matter what its source, whereas, as said by the Court in the *Freeman* v. *Hewit* case, *supra,* ". . . A police regulation of local aspects of interstate commerce is a power often essential to a State in safeguarding vital local interests. At least until Congress chooses to enact a nation-wide rule, the power will not be denied to the State. *The Minnesota Rate Cases,* 230 U. S. 352, 402 et seq.; *S. C. Hwy. Dept.* v. *Barnwell Bros.,* 303 U. S. 177; *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 209-12. . . ."

This leniency toward the police power as compared with· the taxing power of the states inures to the benefit of appellants in the case before us, not only in considering the merits of the differences involved but in weighing the value of the decided cases as precedents.

Suggestion is made by appellee, but not very vigorously urged, that it is not a public utility in its service direct to large industrial consumers in Indiana, and is, therefore, not subject to regulation in connection with such service. By the Natural Gas Act (§ 1 [a]) it appears that the natural gas busi-

ness had been investigated by the Federal Trade Commission and reports had been made to Congress, and upon the basis of such investigation and reports Congress declared that the business of transporting and selling natural gas for 'ultimate distribution to the public is affected with a public interest, and it is traditionally accepted that any business affected with a public interest is subject to regulation and control.

We also have an Indiana statute which defines a public utility, subject to control of the Indiana Public Service Commission, to be ". . . every corporation . . ., that now or hereafter may own, operate or control any . . . plant or equipment . . . for the . . . transmission, delivery or furnishing of heat, light, water or power . . . either directly or indirectly to or for the public. . . ." § 54-105, Burns' 1933.

Another Indiana Statute became law on February 26, 1945, before the orders involved in this action were made by the Indiana Public Service Commission. Acts of 1945, ch. 53, p. 110. This act adds an additional section to the Indiana Public Service Commission Act aimed directly at the natural gas business, and by the act a "gas utility" was defined to mean and include "any public utility selling or proposing to sell or furnish gas directly to any consumer or consumers within the State of Indiana for his, its or their domestic, commercial or industrial use." Certainly appellee is selling and proposing to sell gas directly to consumers in Indiana.

The bottom question on this phase of the case is whether the appellee is furnishing gas in Indiana directly or indirectly to or for the public. Admittedly it is selling gas in Indiana indirectly to and for the public through distributing companies and that makes it a public utility under the In-

diana statute, subject to regulation and control by the Indiana Public Service Commission. Also admittedly it is selling and proposing to sell gas directly to consumers within the state. This part of its business and its interstate transportation and its sale to local distributing utilities are so integrated that in any practical consideration of the state's right to regulate direct sales to consumers that activity must be appraised as a part of its entire business in Indiana. Its rights and duties, with reference to such direct sales, must be determined in the light of its over-all character in the State of Indiana. It will compete with local activities in soliciting industrial business and will be in position to discriminate in its service and in its rates and in its regulations. This freedom is inconsistent with all concepts of the duties and obligations of a person or corporation engaged in such business.

The primary duty of a public utility is to serve on reasonable terms all those who desire the service it renders. This duty does not permit it to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give. *United Fuel Gas Co. v. Railroad Commission* (1929), 278 U. S. 300, 309, 73 L. Ed. 390, 396; *Industrial Gas Co. v. Public Utilities Commission of Ohio* (1939), 135 Ohio St. 408, 21 N. E. (2d) 166, 168. From the last named case, we quote the following:

> "*It may well be urged that a corporation, calculated to compete with public utilities and take away business from them, should be under like regulatory restriction* if effective governmental supervision is to be maintained. Actual or potential competition with other corporations whose business is clothed with a public interest is a factor

to be considered; otherwise corporations could be organized to operate like appellant and in competition with bona fide utilities until the whole state would be honey-combed with them and public regulation would become a sham and delusion.

"What appellant seeks to do is to pick out certain industrial consumers in select territory and serve them under special contracts to the exclusion of all others except such private or domestic consumers as may suit its convenience and advantage. There were other industrial consumers with whom the appellant refused or failed to agree' and so did not serve them. If such consumers were served at all, it must necessarily be by a competitor. If a business so carried on may escape public regulation then there would seem to be no valid reason why appellant may not extend the service to double, triple or many times the number now served without being amenable to regulative measures."

The law, as declared in *Industrial Gas Company* v. *Public Utilities Commission of Ohio, supra,* seems to us fair, reasonable and logical and, when applied to the facts in the case before us, leaves appellee unquestionably in the position of a public utility subject to regulation.

The same thought which was behind the Ohio case, just cited and quoted, with which thought we agree, was also incorporated in *Re Potter Development Co.* (1939), 32 P.U.R., N.S. 45, decided by the Public Service Commission of New York. In that case, the Potter Company sold natural gas to the Corning Glass Works. The Potter Company obtained its gas from an interstate transmission line and piped it to the Corning Glass Works, which is located in the City of Corning, New York. The Glass Works was the only customer served by the Potter Company, but the interstate pipe line also furnished gas to an affiliate which, as a public

utility, operated the gas distribution system in the City of Corning. There was a proceeding to determine whether the Potter Company was a public utility subject to regulation by the New York Public Service Commission. The Commission held that it was, and, in support of its holding, argued that to hold otherwise would invite widespread circumvention of the Public Service law and would result in a multitude of companies supplying gas under special contracts in competition with public utilities and indicated that such a situation would be intolerable.

Reversed with instructions to enter judgment denying plaintiff the relief sought.

Emmert, J. not participating.

NOTE.—Reported in 71 N. E. (2d) 117.