(No. 32728.—

MISSISSIPPI RIVER FUEL CORPORATION *et al.*, Appellees, *vs.* ILLINOIS COMMERCE COMMISSION, Appellant.

*Opinion filed November 18, 1953.*

Schaefer, C.J., and Hershey, J., dissenting.

Latham Castle, Attorney General, of Springfield, (Milton Mallin, William C. Wines, and Jordan Jay Hillmen, of counsel,) for appellant.

Kramer, Campbell, Costello & Wiechert, Bruce A. Campbell, and Norman J. Gundlach, all of East St. Louis, William A. Dougherty, of New York, N. Y., and A. W. Manley, of St. Louis, Mo., for appellees.

Mr. Justice Maxwell delivered the opinion of the court:

This is an appeal by the Illinois Commerce Commission from a judgment of the circuit court of St. Clair County, reversing an order of the commission, entered February 29, 1952, finding Mississippi River Fuel Corporation (hereinafter called Mississippi) to be a public utility within the meaning of section 10 of the Public Utilities Act of this State, and ordering it to comply with the provisions of that act with respect to its direct sales of natural gas to industrial customers in this State.

Mississippi was formed on February 8, 1928, under the laws of Delaware. It built and operates a natural gas pipe-line system extending from the so-called Monroe natural gas field in the State of Louisiana and a natural gas field in Texas to the city of St. Louis, Missouri. Its pipeline system also crosses over into southern Illinois and extends through Randolph, Monroe, St. Clair and Madison counties. On June 29, 1929, it entered into a contract for the sale of natural gas in Illinois with a company known as Cahokia Manufacturers Gas Company for resale and delivery to industries in the East St. Louis area.

In the Cahokia contract, Mississippi agreed to sell to Cahokia the latter's requirements of natural gas for resale to such industries. Attached to the contract was a document marked "Exhibit A," entitled "Probable Consumers of the Mississippi River Fuel Corporation," which listed certain industries, twenty in number, located in and around Alton, Granite City, Madison and East St. Louis, Illinois. These represented customers with whom Mississippi had already negotiated contracts or was in the process of negotiation, and to which Mississippi by agreement reserved the right to make direct sales.

Later in 1929, Mississippi entered into contracts with several of the listed industries for the sale to them of natural gas for their own use, and deliveries of gas under such contracts were inaugurated during that year. In the succeeding six years, Mississippi entered into like contracts for the sale of natural gas to a number of additional industrial customers in the area. In the latter part of 1936, Mississippi made a contract with Illinois Power and Light Company, a gas distributing public utility company, now known as Illinois Power Company, to sell to the latter its requirements of natural gas, for mixture with manufactured gas then being delivered to the public by Illinois Power and Light Company. This contract provided that Mississippi would not sell natural gas in the territory to

any other purchaser except industrial consumers, and would sell only to such reserved industrial consumers as were named on a list attached to the contract. Afterward the property of Cahokia Manufacturers Gas Company, mentioned above, passed into the ownership of Illinois Power and Light Company, with which it was affiliated.

In 1941, Mississippi made another contract with Illinois Power and Light Company for the sale to it of natural gas, in which it agreed not to sell natural gas to any other person within the district defined in the contract. However, it again reserved the right to sell directly to certain industries listed on an exhibit attached to the contract.

In the same year, Mississippi contracted with Union Electric Power Company to sell to the latter its natural gas requirements for resale to customers of all classes in the city of Alton and vicinity. To this contract was likewise appended a list of industrial customers to whom Mississippi reserved the right to make direct sales.

Pursuant to these reservations, Mississippi from time to time made individual contracts with most of the listed industrial customers, for sale to them of natural gas for their own use. It appears that it also at times made similar contracts with certain other industrial customers whose names did not appear on the reserve lists, and the Illinois Commerce Commission in its brief attaches importance to this circumstance. Except as it might have given the purchasing companies a right to bring an action for damages for breach of contract, this does not appear to us to be significant.

As a consequence of the several transactions described above, Mississippi now supplies natural gas in Illinois from its pipelines directly to twenty-three industries under individual contracts running for two years or less, for their own use, and also sells gas in Illinois to Illinois Power Company and Union Electric Company, in the latter two cases for resale to the general public. Requests by addi-

tional industries for gas have been refused by Mississippi. The two sales last named come directly under the terms of the Federal Natural Gas Act, and with respect to them Mississippi is regulated as a "natural gas company" by the Federal Power Commission.

The question before this court is whether its direct sales of gas to twenty-three industries in the industrial area extending from East St. Louis to Alton, and in St. Clair and Madison Counties, Illinois, render it a public utility within the meaning of the Illinois Public Utilities Act, so as to make it subject to the jurisdiction of the Illinois Commerce Commission.

Mississippi contends that the Commission is bound by an earlier order entered by it on January 14, 1949, in a proceeding docketed by it as No. 36,128, in which it found that Mississippi in making these industrial sales was not being conducted as a public utility, and that the sales in question were not for public use. This order was entered as a result of a citation issued by the commission on March 23, 1948. This citation was the first effort ever made by the commission to take jurisdiction over Mississippi. The commission, however, is not a judicial body, and its orders are not *res judicata* in later proceedings before it. It was so held in *Illinois Power and Light Corp.* v. *Commerce Com.* 320 Ill. 427, and in other cases. The concept of public regulation includes of necessity the philosophy that the commission shall have power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding.

Whatever may be the moral obligation of the commission to adhere to the purpose and spirit of its own previous orders, it cannot be said that it is under a legal duty to do so.

The 1948 citation by the commission and the resulting order, though they do not have the binding effect sought

by Mississippi, nevertheless illustrate the fact that for a period of almost 20 years, during which time the personnel and political complexion of the Illinois Commerce Commission repeatedly changed, that body, by its inaction continuously construed the Public Utilities Act as not applicable to Mississippi. The courts of this State are, of course, not bound by the construction which the commission places upon that statute, but still such a consistent and long-standing administrative interpretation cannot but have persuasive effect. The situation suggests the language in *County of Cook* v. *Healy,* 222 Ill. 310: "If it could be said that the language of the constitution was clear and free from any doubt, a contrary legislative and administrative construction would have no weight. (*Jarrot* v. *Jarrot,* 2 Gilm. 1.) But where the words of a constitutional provision admit of doubt, the court may and ought to consider a contemporaneous and practical construction given by the legislature and those concerned in the administration of the law, and also any injurious consequences which would follow a different construction. Where a particular construction has been given to a provision and it has been continued for a long term of years and acquiesced in by the public at large, such construction is entitled to great weight and may be equal in force to a judicial construction."

The fact that the natural gas which is sold by Mississippi to the industrial consumers in question comes into the State of Illinois in interstate commerce is not a material circumstance in view of the decision in *Pennsylvania Gas Company* v. *Public Service Commission of New York,* 252 U.S. 23. It was there held that natural gas brought into the State of New York by pipeline from the State of Pennsylvania and distributed to the general public in New York directly from the interstate pipeline, represented a situation which, in the absence of contrary regulation by Congress, was local in character and that such sales of gas were subject to control by the State of New York. The

present case is therefore not governed by any question of interstate commerce. The case is reduced to the single question whether the sale by Mississippi to the 23 industries in Illinois represents a public utility operation.

The question on these facts is an original one in this court and the issue is not positively controlled by any of our earlier decisions. In the case of *Chicago District Pipeline Co.* v. *Commerce Com.* 361 Ill. 296, upon which the commission dwells in its brief, the company had voluntarily submitted itself as a public utility within the limits of its professed engagement to sell gas to privately owned public utility companies, and the only issue was whether the commission could lawfully require it to sell also to municipally owned utilities. The language of the opinion, so far as it bears upon the present case, we think supports the position of Mississippi. In the opinion it was stated that that company could not be required to assume a public utility status "beyond the scope of its publicly professed obligation." In a dissenting opinion which was filed, emphasis was placed upon the fact that the company's corporate charter did not limit its sales or activities to those so publicly professed. This leads us to note that in the present case, Mississippi's articles of incorporation, which represent the limit of its corporate power, provide expressly that nothing therein "shall be construed to * * * constitute the corporation a common purchaser of gas or oil, or a public utility corporation." The commission, though possessed of broad regulatory powers, nevertheless is not vested with authority to require a corporation to act *ultra vires,* as it has here tried to do.

Apart from this, we think that it is entirely clear from the record that Mississippi has never intended to assume the status of a public utility or professed to devote its property to "public use." The record shows that it did not exercise the right of eminent domain in laying its pipelines in this State, and that it has never taken any municipal or

other public franchise to sell its gas. It has not established uniform rates for the industries which buy gas from it. The prices vary with the contracts, and range from 18 cents per 1000 cubic feet for interruptible gas, to 38.41 cents per 1000 cubic feet for firm gas.

The mere fact that the thing sold by a company is water or gas or electricity or telephone service, such as are ordinarily sold by public utility companies, does not of itself render the seller a public utility. In *Highland Dairy Farms Co.* v. *Helvetia Milk Condensing Co.*, 308 Ill. 294, the dairy company drilled wells for water for its own use and, with the consent of the local authorities, laid water mains in certain streets of the city of Highland. Water was sold from these pipes to 16 customers in that community. A number of other persons sought to purchase water service, but it was refused to them. The case arose out of a demand for service by such a prospective customer. The demand being refused, the matter was taken up with the Illinois Commerce Commission, which determined that "The sale of the water in question was not for public use" and that it had no jurisdiction. On appeal, this court agreed, saying: "A public utility implies a public use of an article, product or service, carrying with it the duty of the producer or manufacturer, or one attempting to furnish the service to serve the public and treat all persons alike, without discrimination. * * * When once determined to be a public utility under the statute the company must furnish all who apply, and the service it furnishes must be without discrimination and without delay. * * *" The same result was reached in *City of St. Louis* v. *Mississippi River Fuel Corporation* (C.C.A. 8th), 97 Fed. 2d 726 (1938). The question there was whether a tax imposed by the city of St. Louis upon persons distributing and selling gas "for public use" in the city applied to Mississippi. The court held that it did not, saying: "Appellee sells and delivers natural gas to fourteen industrial cus-

tomers in St. Louis. Sales to industrial customers are always by special contracts, entered into after negotiations with the customer. The contracts vary as to terms and conditions. They all provide that the gas is to be brought from Louisiana and delivered to the purchaser. Appellee offers no gas to the public directly or generally for any use. * * * By the provisions of the ordinance the tax is imposed only upon every person, firm or corporation engaged in the business of distributing and selling gas 'for heating, lighting, power and refrigeration for public use in the City of St. Louis, through pipe lines laid in the streets * * *.' Selling gas 'for heating, lighting, power and refrigeration' is not enough to bring appellee within its provisions unless it sells 'for public use.' Neither is it sufficient if it had laid its pipe lines in the streets of the city, if such pipe lines are not so laid for the purpose of distributing its gas 'for public use.' " In the case of *Danciger* v. *Public Service Com.* 275 Mo. 483, the court reached the same conclusion.

There are decisions by this court which, while not entirely determinative, state the applicable principles. For example, in *Public Utilities Com. ex rel. Evansville Telephone Co.* v. *Okaw Valley Mutual Telephone Ass'n.,* 282 Ill. 336, where the commission ordered a mutual telephone association to cease operations until it complied with the Public Utilities Act, it appeared that the company rendered telephone service only to its members. Under its bylaws, any surplus funds remaining, after payment of its operating costs, were divided equally among the stockholders. This court held that the commission was without jurisdiction. It said: "While it is not necessary that the benefits be received by the whole public * * * still it is necessary that all persons have an equal right to the use, and such use must not be confined to specific privileged persons to make it a public use within the meaning of said act. 'The question of the nature of a corporation cannot depend

upon the number of persons engaged in the enterprise * * * but the * * * purpose for which it is organized must be ascertained by reference to the terms of its charter, and in the case of a corporation organized under a general law such nature and purpose are defined by that law.' " A similar case is *Public Utilities Com. ex rel. Macon County Telephone Co.* v. *Bethany Mutual Telephone Ass'n*, 270 Ill. 183, where it was held that the mutual telephone association, which by its charter was organized solely to render service to its own members and did so, was not a public utility within the meaning of the act.

We do not consider the decision in *Panhandle Eastern Pipeline Co.* v. *Public Service Com.* 332 U.S. 507, as conclusive. The United States Supreme Court there declined to interfere with a decision of the Indiana State Supreme Court to the effect that direct industrial sales of gas by the pipeline company were under control of the State regulatory statute. It would, of course, have been most inappropriate for that court to overrule the highest State court in Indiana on a question of the meaning of an Indiana statute. The only Federal question involved was whether direct sales of gas to industrial customers were subject to Federal regulation. The Supreme Court naturally held that they were not, section 1(b) of the Federal Natural Gas Act being explicit on that point.

It seems clear to us that Mississippi has consistently and with great care confined its industrial gas sales to specific and selected customers, and has done no act by which it has given the reasonable impression that it was holding itself out to serve gas to the public, or to any class of the public, generally. The interest of the general public, in the area served by Mississippi, is in obtaining an adequate supply of gas at reasonable prices from and through the public utility to which Mississippi supplies natural gas for resale. Such public utility is subject to regulation by the Illinois Commerce Commission. Mississippi is subject to

the exclusive regulation and control of the Federal Power Commission insofar as the supply of gas furnished by it to the public utility and the rates charged therefor are concerned. The regulation and control of both supply and rates by the Federal Power Commission, so far as Mississippi is concerned, and the regulation of the public utility supplying gas to the general public by the Illinois Commerce Commission adequately protect the general public without converting the remainder of Mississippi's operation, which is strictly and clearly a private corporate sales activity in competition with other unregulated fuels, into a public utility.

Under these circumstances, the circuit court was right in holding that the company's action in selling gas to a limited group of industrial customers cannot properly be characterized as the devotion of its property to "public use," within the meaning of the Public Utilities Act of this State.

The judgment of the circuit court of St. Clair County is affirmed.

*Judgment affirmed.*

Mr. CHIEF JUSTICE SCHAEFER, dissenting:

It is important at the outset to state the actual question before us. It is whether Mississippi, in the light of all of the operations in which it engages in Illinois, is a public utility under section 10-3 of the act, (Ill. Rev. Stat. 1951, chap. 111⅔, par. 10.3,) which defines a public utility as "every corporation * * * that now or hereafter: (a) May own, control, operate or manage, within the State, directly or indirectly, for public use, any plant, equipment or property used or to be used for * * * the production, storage, transmission, sale, delivery or furnishing of heat, cold, light, power, electricity or water; or for the conveyance of oil or gas by pipe line; * * * or that (b) May own or control any franchise, license, permit or right to engage in any such business." Since the Commerce Com-

mission has not urged that the act of June 21, 1951, (Ill. Rev. Stat. 1953, chap. 104, pars. 104-112,) is conclusive of Mississippi's status as a public utility, the applicability of that act need not be considered.

Mississippi is the sole supplier of natural gas in the Alton-East St. Louis area. It transports gas by pipeline from Louisiana to Illinois, and sells it in Illinois to two public utilities and to twenty-three industrial consumers. These twenty-three industrial consumers were selected by Mississippi because of their financial stability and their large and constant demand for gas. Mississippi's operations in bringing gas to Illinois and in selling it to local public utilities for ultimate public consumption are conducted under a certificate of public convenience and necessity issued by the Federal Power Commission under the Federal Natural Gas Act. (15 U.S.C. 717 *et seq.*) In this phase of its activities its monopoly is protected and its rates are regulated by the Federal Power Commission. Under the Federal statute it has the right of eminent domain. 15 U.S.C. 717f(h).

It seems clear to me that the certificate of convenience and necessity which Mississippi holds under the Federal Natural Gas Act brings it squarely within the express language of paragraph (b) of section 10-3 of the Public Utilities Act. It holds a "franchise, license, permit or right" from the Federal government to engage in "the conveyance of * * * gas by pipe line." That fact alone, in my opinion, subjects it to the jurisdiction of the commission, and I am unable to understand the statement in the opinion of the court that Mississippi "has never taken any municipal or other public franchise to sell its gas."

It is not necessary, as the opinion of the court seems to suppose, that Mississippi's direct sales to industrial consumers, considered without regard to its sales to utilities for resale to the public, should in themselves suffice to identify it as a public utility. It is true that the commission is not

seeking to exercise jurisdiction over Mississippi's sales to the Illinois utility companies, but that is because those sales are excluded from State control by virtue of the commerce clause and the Federal Natural Gas Act. (*Missouri* v. *Kansas Gas Co.* 265 U.S. 298; *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.* 314 U.S. 498.) Mississippi's sales to the two utilities are unmistakably sales for public use under section 10. (See *Central Illinois Public Service Co.* v. *Illinois Natural Gas Co.* 375 Ill. 634; *Chicago District Pipeline Co.* v. *Commerce Com.* 361 Ill. 296.) The fact that they are, for constitutional reasons, controlled by Federal rather than State authority, does not permit us to ignore them in determining whether Mississippi is a public utility.

Cases in which the concept of public use has been held to prevent control of essentially private operations such as the incidental sale of water procured or power generated for its own internal use by a concern primarily engaged in other activities, are, in my opinion, wide of the mark. (See *Highland Dairy Farms Co.* v. *Helvetia Milk Condensing Co.* 308 Ill. 294; *State ex rel. Danciger* v. *Public Service Com.* 275 Mo. 483, 205 S.W. 36; cf. Pipe Line Cases, 234 U.S. 548.) Mississippi's entire business is the transportation and sale of gas. To hold that by restricting its industrial sales to a selected group of the most desirable customers, Mississippi can require us to regard such sales as for private use is, in my opinion, to condition the application of the statute upon the willingness of a company to comply with it. Other cases relied upon in the opinion of the court, involving mutual telephone companies furnishing service only to their members and lacking entirely any vendor-vendee relationship, are not in point. See *Public Utilities Com.* v. *Bethany Mutual Telephone Ass'n,* 270 Ill. 183; *Public Utilities Com. ex rel. Evansville Tel. Co.* v. *Okaw Valley Mutual Telephone Ass'n,* 282 Ill. 336; but cf. *Public Utilities Com. ex rel. Noble Tel. Co.* v. *Noble Mutual Telephone Co.* 268 Ill. 411.

That those who purchase from Mississippi are content with the situation is irrelevant. A multitude of factors, which may,—or may not,—be related to the public interest, will determine whether the immediate parties are satisfied with their arrangement. It is precisely to insure that factors related to public interest are accorded their proper significance that monopolies are regulated.

The volume of Mississippi's industrial sales is substantial, amounting, in 1950, to 23,923,265 cubic feet, five times the amount sold to its utility customers. Mississippi itself concedes that it has chosen the industrial customers to whom it sells because they are the larger industries having the most substantial gas requirements and the greatest financial strength. One of the purposes of the act is to protect established utilities from competition. (See *West Suburban Transportation Co.* v. *Chicago and West Towns Railway Co.* 309 Ill. 87, 91; *Illinois Power and Light Corp.* v. *Commerce Com.* 320 Ill. 427, 429.) In this case, Mississippi competes directly with the utilities to which it sells. That competition may have important results to those utilities and their consumers. Not long ago we pointed out the inevitable interrelation between sales of gas to industrial consumers and other sales of gas. (See *Produce Terminal Corp.* v. *Commerce Com. ex rel. Peoples Gas Light and Coke Co.* 414 Ill. 582.) The local utilities here involved sell gas to industrial consumers under regulation of the Commerce Commission. By the court's decision, Mississippi's sales, directly competitive, are unregulated.

Factual situations almost identical have recently been before the courts of Indiana and Michigan, and in both cases the power of the State commission over selective industrial sales by the pipe line company was sustained. (*Public Service Com.* v. *Panhandle Eastern Pipeline Co.* 224 Ind. 662, 71 N.E. 2d 117, aff'd, 332 U.S. 507; *Panhandle Eastern Pipe Line Co.* v. *Michigan Public Service*

*Com.* 328 Mich. 650, 44 N.W. 2d 324, aff'd, 341 U.S. 329; cf. *Industrial Gas Co.* v. *Public Utilities Com. of Ohio,* 135 Ohio St. 408, 21 N.E. 2d 166.) The statutory provision involved in the Indiana case was substantially equivalent to section 10 of our statute, and the same contention was made there as appellee makes in this case. In rejecting it, the court stated, "The primary duty of a public utility is to serve on reasonable terms all those who desire the service it tenders. This duty does not permit it to pick and choose and to serve only those portions of the territory which it finds most profitable, * * *." 224 Ind. 662, 686, 71 N.E. 2d 117, 127. The opinion goes on to quote with approval the language of the Ohio court in *Industrial Gas Co.* v. *Public Utilities Commission of Ohio:* "* * * a corporation, calculated to compete with public utilities and take away business from them, should be under like regulatory restriction if effective governmental supervision is to be maintained. * * * otherwise corporations could be organized to operate like appellant and in competition with bona fide utilities until the whole state would be honey-combed with them and public regulation would become a sham and a delusion."

The fact that Mississippi has not exercised its power of eminent domain does not appear significant to me. By virtue of its Federal certificate of convenience and necessity, Mississippi has that power. (15 U.S.C. 717f(h) ; see *Federal Power Com.* v. *East Ohio Gas Co.* 338 U.S. 464, 468.) Whether or not it has heretofore found it necessary or convenient to exercise the power is immaterial.

Nor does the fact that Mississippi sells to its industrial consumers at varying rates militate in its favor. It made a somewhat similar argument when it unsuccessfully resisted enforcement of the Federal Natural Gas Act. The Circuit Court of Appeals disposed of it shortly, saying, "The argument furnishes an additional reason why peti-

tioner's contracts should be within the regulatory scope of the act." *Mississippi River Fuel Corp.* v. *Federal Power Commission,* 121 Fed. 2d 159, 164 (C.C.A. 8, 1941.)

The argument of the court based upon administrative interpretation by the Commerce Commission is not persuasive to me. It is true that over a period of many years the Commerce Commission did not attempt to assert jurisdiction over Mississippi's sales to industrial users. It is also true, however, that during the same period the Commerce Commission has exercised the jurisdiction which it here asserts over pipe line companies whose activities are similar to or identical with those of Mississippi. *Chicago District Pipeline Co.* v. *Commerce Com.* 361 Ill. 296; *Central Illinois Public Service Co.* v. *Illinois Natural Gas Co.* 375 Ill. 634; *Illinois Commerce Com.* v. *Panhandle Eastern Pipeline Co.* 92 P.U.R. (N.S.) 370.

It may be added, finally, that the provision in appellee's articles of incorporation and in its license to do business in Illinois to the effect that it shall not function as a public utility cannot, in my opinion, defeat the jurisdiction of the commission. We have not been so naive in the application of other statutes. We have looked to the facts rather than to the self-serving characterizations of the parties. (*Commonwealth Life and Accident Ins. Co.* v. *Board of Review,* 414 Ill. 475, 482; *Parks Cab Co.* v. *Annunzio,* 412 Ill. 549; *Murphy* v. *Daumit,* 387 Ill. 406, 415.) The appropriate disposition of this contention is that which was made of a similar argument by Mr. Justice Holmes in *Terminal Taxicab Co.* v. *District of Columbia,* 241 U.S. 252, 253: "The facts are agreed. The plaintiff is a Virginia corporation authorized by its charter, with copious verbiage, to build, buy, sell, let and operate automobiles, taxicabs, and other vehicles, and to carry passengers and goods by such vehicles; but not to exercise any of the powers of a public service corporation. It does business in the District, and the important thing is what it does, not what its charter says."

Mr. Justice Hershey concurs in this dissenting opinion.