Freeman Coal Mining Corporation, an Illinois Corporation, Bell & Zoller Coal Company, an Illinois Corporation, and Consolidation Coal Company, a Pennsylvania Corporation, Plaintiffs-Appellants, v. L. Leon Ruff, Director of Mines and Minerals in the Department of Mines and Minerals in the State of Illinois, Harry Williamson, et al., and William G. Clark, Attorney General of the State of Illinois, Defendants-Appellees.

Gen. No. 10,835.

Fourth District.

July 5, 1967.

Rehearing denied August 10, 1967.

145

Giffin, Winning, Lindner & Newkirk, of Springfield (James M. Winning, of counsel), and Lord, Bissell & Brook, of Chicago (Hamilton K. Beebe and Stephen A. Milwid, of counsel), for appellants.

William G. Clark, Attorney General of the State of Illinois, of Chicago (Richard A. Michael, John J. O'Toole, and Lee D. Martin, Assistant Attorneys General, of counsel), for appellees.

CRAVEN, P. J.

In December of 1965, the attorney general issued an opinion construing the Illinois Coal Mining Act of 1953 as amended. Section 2.11 of that act (Ill Rev Stats 1965, c 93, par 2.11) provides that when an opinion of the attorney general is at variance with an opinion of the mining board, then all parties must abide by the attorney general's opinion except that recourse may be had to the courts.

The 1965 opinion was in conflict with an opinion of the attorney general issued in 1956 and at variance with an interpretation of the act issued by the mining board, also in 1956. This proceeding, then, is an action for declaratory judgment to resolve the question in controversy. The sole issue presented is the construction of sections 5.09 and 6.04 of the Illinois Coal Mining Act (Ill Rev Stats 1965, c 93, pars 5.09 and 6.04) as these sections apply to the inspection of gassy mines prior to the entry of workmen on a noncoal-producing shift.

The plaintiffs contend, and the 1956 opinion of the attorney general held, that a gassy mine was required to be examined within twelve hours immediately preceding the

entrance of workmen for a noncoal-producing shift into the underground area. The defendants contend, and the 1965 opinion of the attorney general held, that gassy mines are required to be examined within four hours immediately preceding the entrance of workmen of any shift, coal-producing or noncoal-producing.

The question is one of law. There are no controverted factual issues, and the circuit court granted summary judgment for the defendants and entered a declaratory judgment accordingly. This appeal is from that judgment.

Section 5.09 of the act relates to the duties of the mine manager and provides in part:

"(A) In gassy mines:

"1. When the mine is to be operated he shall have the prescribed working places of such mine examined by a certified mine examiner within 4 hours before the workmen of any shift, other than the examiner or the examiners designated by the mine manager to make the examination, enter the underground areas of such mine. Have the mine examiner inspect every active working place in the mine and make tests therein with a permissible flame safety lamp for accumulation of methane and oxygen deficiency in the air therein; examine seals and doors to determine whether they are functioning properly; inspect and test the roof, face and rib conditions in the working areas and on active roadways and travelways; inspect active roadways, travelways, approaches to abandoned workings and accessible falls in active sections for explosive gas and other hazards; and inspect to determine whether the air in each split is traveling in its proper course and in normal volume.

"...

"4. He shall see that no person, other than competent personnel, enters any underground area in a

gassy mine, except during a coal-producing shift, unless an examination of such area has been made by a mine examiner within 12 hours immediately preceding his entrance into such area."

Section 6.04, also dealing with examination of gassy mines, sets forth the duties of the mine examiners and provides in part:

"(A)　In gassy mines:
"1.　When the mine is to be operated he shall examine the prescribed working places of such mine within 4 hours before any workmen in such shift, other than the examiner or the examiners designated by the Mine Manager to make the examination, enter the underground areas of the mine. Examine every active working place in the mine and make tests therein with a permissible flame safety lamp for accumulation of methane and oxygen deficiency in the air therein; examine seals and doors to determine whether they are functioning properly; inspect and test the roof, face and rib conditions in the working areas and on active roadways and travelways; inspect active roadways, travelways, approaches to abandoned workings and accessible falls in active sections for explosive gas and other hazards; and inspect to determine whether the air in each split is traveling in its proper course and in normal volume. . . ."

There is no language in section 6.04 comparable to the language in subparagraph 4 in section 5.09. If the language of subparagraph 1 of each of the quoted sections, by the use of the term "is to be operated" governs only as to coal-producing shifts, as the plaintiffs contend, then there is no ambiguity in the statutory language and consequently no need for construction. However, the language to be found in the same subparagraph also relates to the workmen of any shift.

148

If subparagraph 4 is applicable and determinative of the need for inspection as to noncoal-producing shifts, as plaintiffs contend, then there is an apparent conflict in the language of subparagraph 1 of both sections and subparagraph 4 of section 5.09, and if not a conflict, certainly an ambiguity appears in the statutory language.

The legislature found no difficulty in expressing itself in clear and unambiguous terms when it sought to describe "coal-producing shift" and distinguish such a shift from a maintenance shift. The phrase "coal-producing shift" is used, as is the phrase "during which coal is produced," and maintenance crews are found to be described as a shift of workmen who are to work and "no coal is to be mined." The absence of this clear and concise language in the two sections under consideration is further evidence of a reasonable difference of opinion as to the legislative intent. The fact that there are conflicting opinions of the attorney general indicates that there must be some vagueness requiring construction to ascertain legislative intent.

■■ Rules of statutory construction are tools or aids for ascertaining legislative intention and the application of a particular rule is not in and of itself determinative of legislative intention. It is, of course, axiomatic that long-standing contemporaneous construction by ones charged with the administration of a particular statute is entitled to great weight in construing the statute. This doctrine of contemporaneous construction becomes even more persuasive when it has been of long standing and the legislature, presumably aware of the administrative interpretation, has amended other sections of the act during the period involved but left untouched the sections subject to the seemingly approved administrative interpretation. Illinois Bell Tel. Co. v. Illinois Commerce Commission, 414 Ill 275, 111 NE2d 329 (1953); People ex rel. Spiegel v. Lyons, 1 Ill2d 409, 115 NE2d 895 (1953); Bell v. South Cook Co. Mosquito Abatement Dist., 3 Ill2d 353,

121 NE2d 473 (1954); Mississippi River Fuel Corp. v. Illinois Commerce Commission, 1 Ill2d 509, 116 NE2d 394 (1953).

As noted, however, rules of construction are mere aids for use in search of legislative intent. We must construe the language and arrive at that intent based upon rules of construction, objects and purposes of the legislation and on other factors.

■ The legislation here in question relates to mine-safety and is aimed at minimizing the possibility of mine disasters. This legislation, then, was enacted to comply with the constitutional mandate that "it shall be the duty of the general assembly to pass such laws as may be necessary for the protection of operative miners, . . . ." (Sec 29, art IV, Ill Const, 1870.) The Supreme Court of this state has repeatedly made reference to this mandate when considering legislation touching on mine safety. Starne v. People, 222 Ill 189, 78 NE 61 (1906); Rogers v. St. Louis-Carterville Coal Co., 254 Ill 104, 98 NE 270 (1912); Fowler v. Johnston City & Big Muddy Coal & Mining Co., 292 Ill 440, 127 NE 31 (1920). This legislation must be liberally construed to make effective the legislative purpose—safety of coal miners.

Turning now to the specific issue in this case, more frequent inspection of gassy mines clearly may be equated with enhanced safety. Examination within four hours before entry of workmen on any shift, coal-producing or noncoal-producing, must decrease the hazard of this, an extrahazardous activity. Nothing in this record establishes or suggests a substantial difference in the exposure to danger between workmen on a coal-producing as distinguished from workmen on a noncoal-producing shift.

■ We are not, therefore, at liberty to read the language of the legislature as to draw a distinction in the degree of safety afforded miners as between the two categories. Thus, we read the language of subparagraph 1 of section 5.09 (A) to be applicable, as it says, to work-

150

men of any shift entering the underground areas. The language of subparagraph 4, as quoted, if read as the plaintiffs contend, as being applicable except to coal-producing shifts, would effectively negative the safety-producing language of subparagraph 1. The circuit court of Sangamon County properly construed the statutory language to reconcile the apparently conflicting provisions and to give effect to both sections. The judgment of that court is affirmed.

.Affirmed.

SMITH and TRAPP, JJ., concur.